**In re CURRENCY CONVERSION FEE ANTITRUST LITIGATION.**

Nos. MDL 1409, M 21–95.

United States District Court,
S.D. New York.

July 7, 2003.

---

### MEMORANDUM AND ORDER

PAULEY, District Judge.

This action consolidates for centralized pretrial proceedings more than twenty putative class actions filed in this Court or transferred here by the Judicial Panel on Multidistrict Litigation. The underlying complaints challenge alleged foreign currency conversion policies by VISA and MasterCard, the two largest credit card networks, and their member banks, including Citigroup, Inc., Bank of America Corporation, Bank One Corporation, J.P. Morgan Chase & Company, Providian Financial Corp., and Household International, Inc. A Revised Consolidated Amended Class Action Complaint ("Complaint" or "Compl.") asserts violations of the Sherman Act, 15 U.S.C. § 1 *et seq.*, arising out of alleged price-fixing conspiracies by and

among VISA, MasterCard, their member banks, and Diners Club concerning foreign currency conversion fees. The Complaint also asserts claims for violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, in the banks' disclosures to their customers. The defendants move to dismiss the Complaint. In addition, some defendants move to compel arbitration. For the following reasons, the motion to dismiss is denied in part and granted in part, and the motion to compel arbitration is granted.

### Background

On a motion to dismiss, the allegations in the Complaint are accepted as true.

There are various payment alternatives in the consumer payment card industry. One involves payment vehicles known as "general purpose cards." They enable consumers to purchase goods or services from a merchant without directly accessing or reserving funds at the time of the purchase. (Compl.¶¶ 7, 81.) There are two primary types of general purpose cards: "credit cards" and "charge cards." Holders of credit cards receive a line of credit from the credit card issuer (generally a bank), and are permitted to charge purchases to their credit cards. Then, they may elect to pay the entire amount due within a fixed period of time, or alternatively pay a portion of the amount and finance the remainder over time. (Compl.¶¶ 8, 81.) In contrast, holders of charge cards are required to pay the entire amount due within a set number of days after receiving a monthly billing statement. (Compl.¶¶ 9, 81.)

A general purpose card transaction includes several different parties: (1) the consumer cardholder; (2) the third-party merchant who accepts the card as payment for goods and/or services; (3) the network association or corporation that owns and operates the network processing the transactions; (4) the bank that issues the card to the consumer; and (5) the bank that contracts with the merchant to accept the card. (Compl.¶¶ 79, 82.) A typical transaction entails the following:

> a merchant accepts a credit card from a customer for the provision of goods and services. The merchant then presents the card transaction data to an "acquirer," typically a bank, for verification and processing. The acquirer presents the transaction data to the association which, in turn, contacts the issuer to check the cardholder's credit line. The issuer then indicates to the association that it authorizes or denies the transaction. The association relays the message to the merchant's acquirer, who then relays the message to the merchant. If the transaction is authorized, the merchant will submit a request for payment to the acquirer, which relays the request, via the association, to the issuer. The issuer pays the acquirer; [and finally] the acquirer pays the merchant and retains a percentage of the purchase price for its services which is shared with the issuer.

(Compl.¶ 83.)

### A. *VISA and MasterCard Associations*

VISA and MasterCard are the two largest general purpose card networks in the world. (Compl.¶ 86.) Those networks are owned by defendants VISA U.S.A., Inc. ("VISA U.S.A.") and VISA International Service Association ("VISA International") (collectively "VISA"), and defendant MasterCard International, Incorporated ("MasterCard"), respectively. VISA and MasterCard are joint ventures or membership associations owned and operated by their member banks. (Compl.¶¶ 35, 38, 90.) Their networks execute transactions that use one of their affiliated general

purpose cards. (Compl.¶ 79.) In turn, member banks are authorized to issue VISA and MasterCard branded general purpose cards. They are also granted rights similar to those of a shareholder in a corporation, including the right to vote for a board of directors, participate in the governance of the association, and receive dividends. (Compl.¶¶ 35, 38, 92.)

The memberships of the VISA and MasterCard associations are virtually identical reflecting a ninety-five percent (95%) overlap. (Compl.¶ 94.) All the defendants in this action, either directly or through a subsidiary or affiliate, are members of both VISA and MasterCard, and issue some type of general purpose card. (Compl.¶¶ 13, 92.) Defendant Citigroup, Inc. ("Citigroup") issues Citibank VISA and MasterCard credit cards, AT & T Universal VISA and MasterCard credit cards, and Diners Club charge cards. (Compl.¶ 41.) Citigroup issues its Citibank cards through its wholly-owned subsidiary defendant Citibank (South Dakota) N.A. ("Citibank (South Dakota)"). (Compl.¶¶ 41–42.) The AT & T Universal credit cards are issued through Citigroup's wholly-owned subsidiaries defendants Universal Financial Corp. and Universal Bank, N.A. Citigroup's Diners Club charge cards are issued through its wholly-owned subsidiary Citibank (South Dakota), and Citibank (South Dakota)'s wholly-owned subsidiary defendant Citicorp Diners Club, Inc. ("Diners Club"). (Compl.¶¶ 41, 43–44, 47–48.)

Defendant Bank of America Corporation ("BOA Corp.") issues its VISA and MasterCard credit cards through its wholly-owned subsidiary defendant Bank of America, N.A. (USA) ("BOA"). (Compl.¶¶ 49–50.) Defendant Bank One Corporation ("Bank One") issues its VISA and MasterCard credit cards through its subsidiary defendant First USA Bank, N.A. ("First USA"). (Compl.¶¶ 54–55.) Defendant J.P. Morgan Chase & Co. ("J.P. Morgan Chase") issues its VISA and MasterCard credit cards through its wholly-owned subsidiaries defendant Chase Manhattan Bank USA, N.A. and defendant The Chase Manhattan Bank. (Compl.¶¶ 59–60.) Defendant Providian Financial Corp. ("Providian") issues its VISA and MasterCard credit cards through its wholly-owned subsidiaries defendant Providian National Bank and defendant Providian Bank. (Compl.¶¶ 64–65.) Defendant Household International, Inc. ("Household") issues its VISA and MasterCard credit cards through its wholly-owned subsidiary defendant Household Finance Corporation. (Compl.¶¶ 66–68.) Defendant MBNA Corporation ("MBNA Corp.") issues its VISA and MasterCard credit cards through its wholly-owned subsidiary defendant MBNA America Bank, N.A. ("MBNA"). (Compl.¶¶ 70–71.) Collectively these defendants and their subsidiaries and affiliates are referred to as the "Issuing Banks." (Compl.¶¶ 13, 84.)

Both VISA and MasterCard are controlled by a select group of their member banks, which include the Issuing Banks. (Compl.¶ 91.) These banks established control by concurrent service on the board of directors and/or important committees of either or both associations. (Compl.¶ 91.) In fact, plaintiffs allege that nearly all of the largest card-issuing member banks have had or currently have a representative of their bank on the board of directors or an important policy-influencing committee of both VISA and MasterCard. (Compl.¶ 95.) For example, in 1996 seventeen of the twenty-seven banks on MasterCard's Business Committee also had a representative on VISA's Marketing Advisors Committee. Also, twelve of the twenty-one banks with a representative on VISA's board of directors had a representative on MasterCard's Business Commit-

tee. (Compl.¶ 95.) In sum, as of year-end 1996, nineteen banks, including defendants J.P. Morgan Chase, Citigroup, and BOA, had a representative on the board of directors of either VISA or MasterCard and a representative on at least one important committee of the other association. (Compl.¶ 96.)

Further, the members of VISA and MasterCard are allocated voting and dissolution rights in relation to the total dollar volume of transactions that member transmits through the particular association. The top ten issuers of VISA and Master-Card cards account for a substantial majority of the total volume of credit card purchases. The Issuing Banks are seven of the top ten issuers of VISA and Master-Card credit cards. In the third quarter of 2001, the seven Issuing Banks accounted for $347 billion in receivables compared to $114 billion for the other forty-three issuers that make up the top fifty issuers of VISA and MasterCard cards. (Compl.¶ 93.)

In effect, plaintiffs allege, the Issuing Banks control both VISA and MasterCard. (Compl.¶¶ 74, 95.) As an illustration of this so-called "dual governance," plaintiffs quote MasterCard's Executive Vice President and General Counsel in a 1992 letter to the Department of Justice, as follows: "when one board acts with respect to a matter, the results of those actions are disseminated to the members which are members in both organizations. As a result, each of the associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment." (Compl.¶ 97.)

## B. *The Currency Conversion Fees*

VISA and MasterCard's electronic networks and settlement systems serve as clearinghouses for general purpose card transactions in foreign countries using cards issued by their member banks. (Compl.¶ 99.) This allows cardholders from the United States to purchase goods or services in foreign countries in that country's currency. (Compl.¶ 99.) That amount is then converted to U.S. dollars by the respective network and billed to the United States cardholder in U.S. dollars. The prevailing conversion rate for the applicable foreign currency is applied to the cardholders' transactions. (Compl.¶¶ 79, 85.)

As part of the conversion, cardholders are charged a currency conversion fee ranging from at least one percent (1%) to at most three percent three percent (3%) of the cost of the purchase. (Compl.¶¶ 1, 12, 102.) However, plaintiffs allege that this fee is charged whether or not currency is actually converted or exchanged. (Compl.¶ 12, 100.) More specifically, plaintiffs allege that the procedure VISA and MasterCard use to process all foreign currency transactions, sometimes referred to as "netting out," often leads to the bulk of foreign currency transactions being conducted without an actual purchase or sale of any foreign currency. (Compl.¶ 100.) Plaintiffs offer the following example: "if 100 U.S. VISA cardholders in France charge U.S. $10,000 in French francs in goods on March 26, 2001, and 100 French VISA cardholders in the U.S. spend the equivalent of U.S. $10,000 on the same day, defendant VISA does not actually convert any currency." (Compl.¶ 100.) VISA and MasterCard automatically impose this currency conversion fee on the cardholder at the network level. (Compl.¶ 99.)

There are two tranches of currency conversion fees charged by VISA and Master-Card. The first, which plaintiffs label the "first tier" fee, is charged by VISA and MasterCard at an identical 1% of the pur-

chase price. (Compl.¶ 102.) This 1% first tier fee is paid by the cardholder and retained by the respective associations. (Compl.¶¶ 102, 107.) The "second tier" fee is "typically" two percent (2%), and is often charged on top of the 1% first tier fee. (Compl.¶ 102.) This 2% second tier fee is automatically charged by the network, paid by the cardholder, and retained by the cardholder's issuing bank, (Compl.¶¶ 99, 102.)

### 1. First Tier Fee

In the 1980's VISA and MasterCard began to impose the first tier fee, and made it payable by the cardholders, not the member banks. (Compl.¶¶ 103, 104.) Plaintiffs contend that although the member banks generally compete against each other on many price terms, such as interest rates, annual fees, and services charged through VISA and MasterCard, they colluded to charge a floor price of 1% as a first tier currency conversion fee. (Compl.¶ 106.) Plaintiffs specifically allege that VISA, MasterCard, and their member banks horizontally fixed the amount of this first tier fee, both within and between the associations. (Compl.¶ 105.)

The first tier fee has been extremely profitable to VISA and MasterCard. (Compl.¶ 107.) Plaintiffs claim that there is no nexus between any purported transaction cost to the VISA or MasterCard networks, or the value of the transaction itself, and the imposition of the first tier fee. The first tier fee is far higher than the nominal transaction cost incurred by the associations. (Compl.¶ 108.)

The Complaint alleges that the common control of VISA and MasterCard by the largest member banks, and the common issuance of VISA and MasterCard branded cards by those same banks provides the inter-association communication necessary to fix and maintain the fee. (Compl.¶ 109.)

Indeed, plaintiffs assert that VISA communicated its intent to set the price of its currency conversion fee at 1% "in a manner calculated to reach MasterCard well in advance of implementation." (Compl.¶ 110.) Specifically, plaintiffs allege that it was no more than four months prior to implementation of the 1% first tier fee that VISA first communicated its intentions to MasterCard. (Compl.¶ 110.) On learning of VISA's plans, the Complaint alleges that MasterCard abandoned its plan to impose a currency conversion fee of twenty-five (25) basis points and instead imposed a 1% fee. (Compl.¶ 110.)

Plaintiffs contend that this first tier fee is neither necessary to the operation of the VISA and MasterCard networks, nor facilitates a service or product that would not otherwise exist. According to the Complaint, the fee does not enhance price competition for foreign currency transactions; rather it eliminates it. (Compl.¶ 111.) Moreover, the fee is not a cost-shifting device among VISA or MasterCard member banks. (Compl.¶ 113.) As such, plaintiffs allege that its anti-competitive effect outweighs any pro-competitive benefit. (Compl.¶ 112.)

Further, plaintiffs allege that the first tier fee is an artificial price floor that restrains trade because the member banks of VISA and MasterCard do not compete against each other within a network, and VISA and MasterCard themselves do not compete against each other. This results in an anti-competitive restraint of trade that harms consumers and sets an artificially high fixed first tier fee. (Compl.¶ 114.) Plaintiffs also contend that competition among the member banks is critical because each bank issues both VISA and MasterCard branded cards. This competition, however, is undermined by the defendants' collusion to set a fixed price for their currency conversion fees.

(Compl. ¶ 115.) Lastly, plaintiffs allege that this agreement among the defendants causes VISA and MasterCard to act as an organizational vehicle for violations of the law, and not as an efficiency-enhancing joint venture. (Compl. ¶ 116.)

### 2. Second Tier Fee

According to the Complaint, the second tier fee, which "is almost pure profit to the Issuing Banks," is imposed on top of the first tier floor fixed by VISA, MasterCard, and their members. (Compl. ¶¶ 117–18.) "Typically," that second tier fee represents 2% of the foreign currency transaction. (Compl. ¶ 102.) The Complaint asserts that often, the rate is more than 2% of the purchase price because it is calculated based on the total amount of the foreign currency transaction including the 1% first tier fee. (Compl. ¶ 128.) According to plaintiffs, the Issuing Banks incur no expense in connection with the second tier fee because it is VISA and MasterCard at the network level that convert the foreign currency. (Compl. ¶ 118.)

Plaintiffs allege that VISA and MasterCard aided and abetted their respective member banks' collection of the second tier fees by adding that fee to a cardholders' charge during the conversion process. Plaintiffs also contend that VISA and MasterCard modified their procedures to enable imposition of the second tier fee. (Compl. ¶ 118.)

The Complaint asserts that absent collusion in the market, imposition of second tier fees would be against the economic self-interest of each Issuing Bank. (Compl. ¶ 119.) Thus, plaintiffs contend that the Issuing Banks would lose some of their best customers to banks that did not impose the 2% second tier fee were it not for an agreement to act in concert and the attendant concealment of that fee. (Compl. ¶ 119.)

Finally, the Complaint alleges a steady decline in costs occasioned by rapid technological innovations, as well as a decrease in fraud rates, since the imposition of these currency conversion fees. Nevertheless, fees for foreign exchange services have increased dramatically. According to plaintiffs, the reason for such an anomalous scenario is that the fees were set collusively and free competition has been restrained. (Compl. ¶ 120.)

### 3. Diners Club

Diners Club is another general purpose card electronic network and settlement system that processes Diners Club card transactions. (Compl. ¶ 121.) Unlike VISA and MasterCard, it is not a joint venture or member association. The Diners Club network is owned and operated by defendant Citicorp Diners Club, Inc. ("Diners Club"), which issues the Diners Club charge card. (Compl. ¶¶ 48, 121.) The Diners Club network permits U.S. cardholders to make purchases in foreign countries in that nation's currency while being billed for those foreign transactions in U.S. dollars. (Compl. ¶ 121.)

Like VISA and MasterCard, Diners Club imposes a currency conversion fee on its cardholders' foreign currency transactions. According to the Complaint, Diners Club formerly charged a 1% fee on foreign currency transactions, but then increased that fee to 2% "in line with the recent proliferation" of second tier fees. (Compl. ¶ 122.) Plaintiffs allege that Diners Club "imposed [this 2% fee] ... under the price-fixed 'umbrella' created by their participation in the conspiracy with the VISA and MasterCard Associations and other member banks." (Compl. ¶ 122.)

Further, plaintiffs allege that Diners Club is an active and integral part of the conspiracy to impose currency conversion

fees. (Compl.¶ 123.) The Complaint asserts that Diners Club's parent companies' substantial involvement in the VISA and MasterCard associations facilitates its participation in the price-fixing agreements. (Compl.¶ 123.) Lastly, Diners Club's fee is alleged to be against its economic self-interest absent an agreement with the other Citibank defendants, VISA, and MasterCard. (Compl. ¶ 124.)

### C. *Non–Disclosures of the Currency Conversion Fees*

In substance, plaintiffs allege that VISA and MasterCard, together with their member banks, and Diners Club failed to disclose adequately the existence and amount of their currency conversion fees to their cardholders on the monthly billing statements or the solicitations and applications for the general purpose cards. (Compl.¶¶ 125, 126.) According to the Complaint, the failure to disclose the currency conversion fees in solicitations is aggravated by the fact that the solicitations are the primary source of information to prospective cardholders about fees, finance charges, and card features. (Compl.¶ 126.) Moreover, some of defendants' monthly statements report a foreign currency transaction without revealing a fee by simply listing the amount of the charge in the foreign currency and the corresponding amount in U.S. dollars. Still other statements identify a "rate" and fail to disclose the addition of currency conversion fees or the date of the conversion. (Compl.¶ 127.)

The Complaint also alleges that the monthly statements hindered a cardholder's ability to corroborate the conversion rate utilized on a specific transaction. For example, neither the base exchange rate nor the date of the conversion were disclosed. Further, plaintiffs assert that the statements failed to itemize separately the actual base currency conversion rate, the first tier fees, or the second tier fees. (Compl.¶ 128.)

According to the Complaint, the only place currency conversion fees were even partially disclosed was in the cardmember agreement or the initial disclosure statement, which were sent to cardholders when they received their cards. (Compl.¶ 129.) The Complaint alleges that these "partial disclosures" obscured the fees and violated the disclosure requirements of the Truth in Lending Act ("TILA"). (Compl.¶ 129.) Plaintiffs further allege that the defendants conspired through their memberships in the VISA and MasterCard associations to withhold disclosure of the currency conversion fees in solicitations and billing statements, and confusingly disclosed the fees in cardholder agreements. (Compl.¶ 130.)

Based on these allegations, plaintiffs bring five claims: (I) antitrust violations under Section One of the Sherman Act against all defendants; (II) antitrust violations under Section One of the Sherman Act against VISA and the Issuing Bank defendants; (III) antitrust violations under Section One of the Sherman Act against MasterCard and the Issuing Bank defendants; (IV) violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, against all defendants; and (V) violations of South Dakota Consumer Protection Statutes against defendant Citibank (South Dakota).

Counts I through III assert two different theories of conspiracy. Count I alleges the first conspiracy theory—an "inter-association" conspiracy between and among Diners Club, VISA (together with its members), and MasterCard (together with its members), to fix currency conversion fees charged to cardholders of "no less than 1% of the transaction amount and frequently more." (Compl.¶¶ 150, 154.)

Counts II and III advance the second conspiracy theory—two separate "intra-association" conspiracies whereby VISA and MasterCard each are claimed to have conspired separately with their respective member banks to fix currency conversion fees charged to cardholders of "no less than 1% of the transaction amount" and "to facilitate and encourage institution—and collection—of second tier currency conversion surcharges." (Compl.¶¶ 157–58.)

Count IV alleges that defendants failed to properly disclose the currency conversion fees on purchases made in foreign currencies in violation of TILA disclosure requirements and the regulations promulgated thereunder in Federal Reserve Board Regulation Z, 12 C.F.R. § 226. (Compl.¶¶ 170–71.) Plaintiffs allege that defendants VISA and MasterCard are liable for the TILA violations because they acted as agents of the Issuing Bank defendants within the meaning of TILA and Regulation Z. (Compl.¶¶ 172–73.) Finally, plaintiffs assert that VISA and MasterCard are liable for the TILA violations because they and their member banks conspired to violate TILA, and because VISA and MasterCard aided and abetted their member banks' violations of TILA. (Compl.¶¶ 174, 176.)

Defendants move to dismiss Counts I through IV for failure to state a claim on which relief may be granted. Defendants First USA, BOA, and MBNA, and their respective parent corporations join in the omnibus motion to dismiss and also move to stay the claims against them by their respective cardholders and refer those claims to arbitration. Lastly, defendants argue that the time to answer or otherwise move on the fifth cause of action is tolled by their motion to dismiss since all of the factual allegations in the Complaint are subject to the motion. Plaintiffs do not contest defendants' tolling argument, and this Court adopts it.

For the following reasons, the motion to dismiss is denied in part and granted in part, and the motion to compel arbitration is granted.

### Discussion

#### I. Motion to Compel Arbitration

Defendants First USA; Bank One; BOA; BOA Corp.; MBNA; and MBNA Corp. move to stay all claims against them by their respective cardholders and compel arbitration of those claims pursuant to their cardmember agreements.

Defendants First USA, BOA, and MBNA issue First USA, Bank of America, and MBNA credit cards, respectively. Defendants Bank One, BOA Corp., and MBNA Corp. are the parent companies of defendants First USA, BOA, and MBNA, respectively, and do not issue credit cards. (Decl. of Janet Z. Hernandez dated March 11, 2002, ¶ 2; Decl. of Kimberly S. Gensler dated March 18, 2002, ¶ 3; Decl. of Deborah L. Fisher dated March 19, 2002, ("Fisher Decl.") ¶ 2.) When First USA, BOA, and MBNA send credit cards to their cardholders, they forward a cardholder agreement setting forth the terms of the cardholders' account. The cardholder agreement warns that any use of the credit card constitutes acceptance of the terms of the cardholder agreement. (Fisher Decl. ¶ 6; Decl. of Donna Barrett dated March 7, 2002, ("Barrett Decl.") ¶¶ 4–5; Decl. of Suzan R. Uhlig dated March 18, 2002, ("Uhlig Decl.") ¶ 9 (advising that cardholder's silence constitutes acceptance of the terms).)

Although plaintiffs do not specifically allege in their Complaint which plaintiffs are cardmembers of which defendant, the parties agree on the following: (1) plaintiff Caran Ruga is the only named plaintiff to

have held a First USA credit card during the relevant time period; (2) plaintiff Robert Ross[1] is the only named plaintiff to have held a BOA credit card during the relevant time period; and (3) "none of the named plaintiffs have used an MBNA credit card to make purchases in a foreign country." (Letter from plaintiffs' counsel to counsel for MBNA dated Feb. 19, 2002, cited in Defs.' Mot. to Compel Arb. at 7 n. 2.)

Plaintiffs acknowledge that none of the plaintiffs have an arbitration agreement with MBNA. (Pls.' Opp. to Mot. to Compel. Arb. at 1.) Thus, without an MBNA cardmember as a named plaintiff, there is no need to analyze whether any MBNA cardmember's claims belong in arbitration. Further, the fact that there are no named plaintiffs that are cardmembers of MBNA limits any possible TILA claims against MBNA to claims of secondary liability.

The First USA cardholder agreement sent to plaintiff Ruga provides that "[a]ny use of your Card or Account confirms your acceptance of the terms and conditions of this Agreement." (Barrett Decl. ¶ 5.) Plaintiff Ruga accepted the terms of the cardholder agreement by using her First USA credit card. (Barrett Decl. ¶ 5.)

Plaintiff Ruga's cardholder agreement contains an arbitration clause that was typical of all First USA cardholder agreements, which states:

> Arbitration: Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed.... Any arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16. Judgement upon any arbitration award may be entered in any court having jurisdiction.
>
> This arbitration agreement applies to all Claims now in existence or that may arise in the future except for Claims by or against any unaffiliated third party to whom ownership of your Account may be assigned after default (unless that party elects to arbitrate). Nothing in this Agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owed by either party to the other under this Agreement.
>
> IN ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE

---

1. The records of BOA indicate that a Nancy Ross is also a responsible party for the only credit card account that plaintiff Ross is responsible for at BOA. However, since Nancy Ross is not a named plaintiff to this action, this Court will treat plaintiff Ross's account as if it were held in his name alone. (Uhlig Decl. ¶¶ 4–6.)

PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

(Barrett Decl. Ex. 1.) Plaintiff Ruga's cardholder agreement also contained a choice of law provision selecting Delaware law and federal law where applicable. (Barrett Decl. Ex. 1.)

Plaintiff Ross was a BOA cardholder prior to BOA's inclusion of an arbitration clause in its cardholder agreement. In February 2000, plaintiff Ross received a document titled, "Important Notice Regarding Your Account" ("Important Notice"), with his monthly account statement. The Important Notice advised him of certain changes in the cardholder agreement governing his account, and included a copy of the amended agreement. (Uhlig Decl. ¶ 7.) The Important Notice also informed plaintiff Ross that these modifications to the agreement would become effective unless he wrote to BOA by March 25, 2000, and requested that his account be closed. Plaintiff Ross never took that initiative. (Uhlig Decl. ¶¶ 9–10.)

Among the changes to the BOA cardholder agreement was the addition of an arbitration clause. (Uhlig Decl. ¶ 8 & Ex. 2.) The Important Notice described the changes to the cardholder agreement and included the following: "Any claim, dispute or controversy with us, Bank of America Corporation or our affiliates, or certain other persons will be resolved by arbitration, as set forth in the Agreement. (Refer to Section 7.19.)" (Uhlig Decl. Ex. 2.) Section 7.19 of the amended cardholder agreement, as included in the Important Notice, provided:

**7.19 Arbitration.** Any dispute, claim, or controversy ("Claim") by or between you and us (including each other's employees, agents or assigns) arising out of or relating to this Agreement, your Account, or the validity or scope of any provision of this Agreement, including the arbitration clause shall, upon election by either you or us, be resolved by binding arbitration.

Arbitration shall take place before a single arbitrator on an individual basis without resort to any form of class action. Arbitration may be selected at any time unless a judgement has been rendered or the other party would suffer substantial prejudice by the delay in demanding arbitration.

Arbitration, including selection of an arbitrator, shall be conducted in accordance with the rules for arbitration of financial services disputes of JAMS .... If JAMS is unable or unwilling to serve as the provider of arbitration, we may substitute another national arbitration organization with similar procedures. This arbitration section of this Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16. Judgment upon arbitration may be entered in any court having jurisdiction. Arbitration shall be conducted in the federal judicial district in which your billing address is located at the time the claim is filed. If we request arbitration, we will advance applicable JAMS fees and expenses. If the arbitrator rules in favor of one party against the other, the other party shall pay all reasonable attorneys' fees and costs of the action on behalf of both parties (including any fees and expenses paid by one party on behalf of the other) unless the arbitrator or court decides such an award would cause a substantial injustice based on the facts and legal arguments set forth in the action.

YOU UNDERSTAND AND AGREE THAT IF EITHER YOU OR WE ELECT TO ARBITRATE A CLAIM, THIS ARBITRATION SECTION PRECLUDES YOU AND U.S. FROM

HAVING A RIGHT OR OPPORTUNI-
TY TO LITIGATE CLAIMS
THROUGH COURT, OR TO PARTICI-
PATE OR BE REPRESENTED IN
LITIGATION FILED IN COURT BY
OTHERS. EXCEPT AS OTHER-
WISE PROVIDED ABOVE, ALL
CLAIMS MUST BE RESOLVED
THROUGH ARBITRATION IF YOU
OR WE ELECT TO ARBITRATE.

(Uhlig Decl. Ex. 2.) Plaintiff Ross's card-holder agreement also contained a choice of law provision selecting Arizona law and federal law where applicable. (Uhlig Decl. Ex. 2, § 7.18.)

When a contract contains a written arbitration clause and concerns a transaction involving commerce, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.* (2003), governs. 9 U.S.C. § 2. The FAA establishes a liberal policy in favor of arbitration as a means to reduce the costliness and delays of litigation. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir.1997) (Pollack J., by designation); *see also Oldroyd v. Elmira Savings Bank, FSB*, 134 F.3d 72, 76 (2d Cir.1998) ("There is a strong federal policy favoring arbitration as an alternative means of dispute resolution.").

It is well settled that arbitration is contractual in nature, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); *accord Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002). In accord with the strong policy favoring arbitration, federal courts read arbitration clauses as broadly as possible, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *accord ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002); *Oldroyd*, 134 F.3d at 76; *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir.1995). Indeed, arbitration must be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers*, 363 U.S. at 582–83, 80 S.Ct. 1347; *accord David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir.1991); *Collins & Aikman*, 58 F.3d at 19.

Section Two of the FAA provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 of the FAA provides that the court must stay any suit or proceeding until arbitration has been completed if the action concerns "any issue referable to arbitration" under a written agreement for such arbitration. 9 U.S.C. § 3; *accord Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *McMahan Secs. Co. L.P. v. Forum Capital Mkts., L.P.*, 35 F.3d 82, 85 (2d Cir.1994). The FAA "leaves no place for the exercise of discretion by a district court but instead mandates that district courts shall direct the parties to proceed to arbitration on issues [on] which an arbitration agreement has been signed." *E.G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.*, No. 97–7102(LAK), 1998 WL 314767, at *2 (S.D.N.Y. Jun.15, 1998) (quoting *Byrd*, 470 U.S. at 218, 105 S.Ct. 1238).

■ This Court must analyze four factors in considering a motion to compel arbitration:

> first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Oldroyd,* 134 F.3d at 75–76; *accord Campaniello Imports,* 117 F.3d at 665; *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987).

There is no dispute about the existence of an arbitration clause in both plaintiffs Ruga and Ross's cardholder agreements, and that both plaintiffs agreed to it.[2] However, there is a dispute as to who can compel arbitration. Defendants Bank One and BOA Corp. argue that plaintiffs Ruga and Ross's claims against Bank One and BOA Corp. should be referred to arbitration, despite the fact that neither of them are signatories to the arbitration agreements. Since "whether an entity is a party to the arbitration agreement also is included within the broader issue of whether the parties agreed to arbitrate," the Court will address the non-signatories issue first. *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l,* 198 F.3d 88, 95 (2d Cir.1999).

## A. *Non–Signatories*

The First USA and BOA arbitration agreements are agreements between the cardholders and First USA and BOA, respectively. Plaintiffs however, allege claims against First USA and BOA, as well as Bank One and BOA Corp., the parent companies of First USA and BOA, respectively. Defendants argue that plaintiffs should be compelled to arbitrate the claims against the parent companies as well as those against First USA and BOA.

Although "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *Howsam,* 123 S.Ct. at 591 (quoting *United Steelworkers,* 363 U.S. at 582, 80 S.Ct. 1347), an obligation to arbitrate may not be limited to signatories to the agreement containing the arbitration provision.

■ A non-signatory may be bound to an arbitration agreement under ordinary principles of contract and agency. *See Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995); *Orange Chicken, L.L.C. v. Nambe Mills, Inc.,* No. 00 Civ. 4730(AGS), 2000 WL 1858556, at *4–5 (S.D.N.Y. Dec.19, 2000); *Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.,* No. 98 Civ. 7181(WHP), 1999 WL 637236, at *6 (S.D.N.Y. Aug.20, 1999). The Second Circuit has recognized five theories for binding non-signatories to

---

**2.** Plaintiffs' reliance on *Specht v. Netscape Communications Corp.,* 306 F.3d 17 (2d Cir. 2002), for the proposition that the arbitration agreement was never entered into between plaintiffs Ruga and Ross and First USA and BOA, respectively, is misplaced. The Second Circuit in *Specht* noted, at least under California law, that receipt of a physical document containing contractual terms or notice thereof, puts a person on inquiry notice of all the terms in that physical document. *Specht,* 306 F.3d at 31. The *Specht* court found that in "circumstances ... where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." 306 F.3d at 32. This is in contrast to this action where each plaintiff received a physical copy of the arbitration agreement.

arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter-ego; and 5) estoppel. *See Smith/Enron Cogeneration,* 198 F.3d at 97; *Thomson–CSF,* 64 F.3d at 776; *Massen v. Cliff,* No. 02 Civ. 9282(HBP), 2003 WL 2012404, at *3 (S.D.N.Y. May 1, 2003); *Fluor Daniel,* 1999 WL 637236, at *6. Defendants argue that the plaintiffs are estopped from avoiding arbitration with Bank One and BOA Corp.[3]

Courts have bound non-signatories to arbitration agreements under an estoppel theory. Under one branch of this theory, when a non-signatory receives a direct benefit under the agreement containing the arbitration clause, it cannot avoid arbitration merely because it never signed the agreement. This branch of the estoppel theory is inapplicable here because it is the non-signatory who is trying to compel arbitration from a party. *See Fluor Daniel,* 1999 WL 637236, at *6.

■ Under an alternative estoppel theory recognized by several circuits, courts have been willing to estop a signatory from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to arbitrate are intertwined with the contract. *See Choctaw Gen. Ltd. P'ship v. Am. Home Assurance Co.,* 271 F.3d 403, 406 (2d Cir.2001); *Thomson–CSF,* 64 F.3d at 779; *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757–58 (11th Cir.1993); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.,* 741 F.2d 342, 344 (11th Cir.1984); *Massen,* 2003 WL 2012404, at *4; *Chase Mortgage Co.–West v. Bankers Trust Co.,* No. 00 Civ. 8150(MBM), 2001 WL 547224, at *2

(S.D.N.Y. May 23, 2001); *Fluor Daniel,* 1999 WL 637236, at *6. Thus, a signatory can be required to arbitrate with a non-signatory at the non-signatory's insistence because of "the close relationship between the entities involved, ... [and] the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract ... and [the fact that] the claims were 'intimately founded in and intertwined with the underlying contract obligations.'" *Sunkist,* 10 F.3d at 757–58 (quoting *Hughes Masonry Co. v. Greater Clark County School Bldg. Corp.,* 659 F.2d 836, 841 (7th Cir.1981)); *accord Choctaw,* 271 F.3d at 406; *Fluor Daniel,* 1999 WL 637236, at *6.

Whether the claims are intertwined such that a signatory is estopped from avoiding arbitration with a non-signatory, the court must determine: (1) whether the signatory's claims arise under the "subject matter" of the underlying agreement; and (2) whether there is a "close relationship" between the signatory and the non-signatory. *Chase Mortgage,* 2001 WL 547224, at *2–3; *accord Choctaw,* 271 F.3d at 406; *Massen,* 2003 WL 2012404, at *4; *Orange Chicken,* 2000 WL 1858556, at *5; *Fluor Daniel,* 1999 WL 637236, at *6.

■ There are several principled grounds for finding estoppel in this action. First, the alleged wrongs by Bank One and BOA Corp. are "intimately founded in and intertwined with" the underlying agreement between First USA and BOA and their respective cardholders. Bank One and BOA Corp. are being sued for their respective subsidiaries' TILA violations and conspiracy to fix the prices of currency conversion fees. Both of these claims are derivative in nature in that the alleged

---

**3.** Although plaintiffs have alleged that First USA and Bank One on the one hand, and BOA and BOA Corp. on the other, are agents of each other, and that the parents are the alter egos of the subsidiaries, the factual basis for such a finding is lacking. More importantly, defendants do not rely on these allegations in their argument for arbitration.

wrongdoers are First USA and BOA, and not Bank One and BOA Corp. Further, plaintiffs' claims against Bank One and BOA Corp. arise from the cardholder agreements. Specifically, it was plaintiffs' credit cards, which are the subject matter of the cardholder agreements, that were allegedly unlawfully charged fixed currency conversion fees. Also, the documents provided in connection with plaintiffs' credit card accounts were allegedly violative of the disclosure obligations in TILA. Effectively, the claims against Bank One and BOA Corp. are the same as those lodged against First USA and BOA, respectively. As such, they arise under the "subject matter" of the agreement. *See Chase Mortgage,* 2001 WL 547224, at *2; *Fluor Daniel,* 1999 WL 637236, at *6.

Plaintiffs insist that they are not suing the parent companies merely based on their subsidiaries' actions, but that they also allege that the parent companies were active participants in the conspiracy. This contention, however, does not change the outcome of the analysis. Any participation by Bank One and BOA Corp. in the alleged conspiracy necessarily revolves around their respective subsidiaries' issuance of credit cards. Those credit cards and their respective accounts are at the heart of the underlying contract containing the arbitration agreement. Therefore, this Court finds that even the allegations that seek to hold Bank One and BOA Corp. liable for their own conduct arise under the "subject matter" of the underlying agreement between plaintiffs and First USA and BOA.

Moreover, there is a close relationship between First USA and Bank One, and between BOA and BOA Corp. Bank One is the parent corporation of its wholly-owned subsidiary First USA, and BOA Corp. is the parent corporation of its wholly-owned subsidiary BOA. This more than satisfies the "close relationship" factor. *See Chase Mortgage,* 2001 WL 547224, at *3; *see also Fluor Daniel,* 1999 WL 637236, at *6 (finding sufficiently close relationship where non-signatory owned fifty percent of signatory).

Accordingly, this Court finds that, assuming the claims are otherwise arbitrable against First USA and BOA, it is appropriate to compel plaintiffs Ruga and Ross to also arbitrate their claims against Bank One and BOA Corp. under an estoppel theory.

### B. *Scope of Arbitration Agreement*

As an initial matter, defendants argue that this Court should not reach the question of whether plaintiffs' claims are within the scope of the arbitration clauses. Defendants contend that this issue of arbitrability is a question for the arbitrator in the first instance.

"Although the [Supreme] Court has also long recognized and enforced a 'liberal federal policy favoring arbitration agreements,' it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam,* 123 S.Ct. at 591 (quoting *AT & T Techs.,* 475 U.S. at 649, 106 S.Ct. 1415; *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); and citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)) (emphasis in original). Specifically, the Supreme Court recently reiterated that "a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court." *Howsam,* 123 S.Ct. at

592 (citing *AT & T Techs.*, 475 U.S. at 651–52, 106 S.Ct. 1415; *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241–43, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962)).

■ "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944, 115 S.Ct. 1920; *accord Cap Gemini Ernst & Young U.S. LLC v. Nackel*, No. 02 Civ. 6872(DLC), 2002 WL 31626703, at *2 (S.D.N.Y. Nov.21, 2002). However, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs.*, 475 U.S. at 649, 106 S.Ct. 1415; *accord Howsam*, 123 S.Ct. at 592; *Nackel*, 2002 WL 31626703, at *2.

■ The First USA arbitration clause provides, in part,

> Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, *including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement*, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed.

(Barrett Decl. Ex. 1 (emphasis added).)

■ The BOA arbitration clause provides, in part,

> Any dispute, claim, or controversy ("Claim") by or between you and us

(including each other's employees, agents or assigns) arising out of or relating to this Agreement, your Account, or *the validity or scope of any provision of this Agreement, including the arbitration clause shall*, upon election by either you or us, be resolved by binding arbitration.

(Uhlig Decl. Ex. 2, § 7.19 (emphasis added).)

Plaintiffs argue that the language emphasized above cannot be deemed "clear and unmistakable" evidence that either plaintiff Ruga or Ross agreed to have the arbitrator decide the question of arbitrability. This Court disagrees.

Both arbitration provisions specifically provide evidence that the plaintiffs "clearly and unmistakably" agreed to have the arbitrator decide the question of arbitrability. The First USA clause specifically states that "Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement" shall be arbitrated.[4] The BOA clause specifically states that any claim relating to "the validity or scope of any provision of this Agreement, including the arbitration clause shall" be arbitrated. These provisions evidence the parties' intent that the arbitrator, not the Court, is to determine arbitrability. *See Green Tree Fin. Corp. v. Bazzle*, No. 02–634, — U.S. ——, 123 S.Ct. 2402, 2407, 156 L.Ed.2d 414 (2003) (plurality opinion) ("The parties agreed to submit to the arbitrator '[a]ll disputes, claims, or controversies arising from or relating to this contract or the relationships which result from this contract.' And the dispute about what the arbitration contract in each case means ... is a

---

**4.** Plaintiffs' argument that the question of arbitrability is a "legal issue" and not a "Claim" as that word is used in the First USA arbitration clause is without merit. The term "Claim" is defined in the arbitration clause to include "[a]ny claim, dispute or controversy." (Barrett Decl. Ex. 1.) Clearly, the question of whether the arbitrator or the Court should determine arbitrability can, and should, be deemed a claim, dispute or controversy.

dispute 'relating to this contract' and the resulting 'relationships.' Hence, the parties seem to have agreed that an arbitrator, not a judge, would answer the relevant question." (emphasis in original)); *see also Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121–22 (2d Cir.2003) (finding that, under New York law, clause stating that "any disputes concerning or arising out of" contract shall be arbitrated was evidence that parties "clearly and unmistakably" agreed to have the arbitrator decide the question of arbitrability); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1196, 1199–1200 (2d Cir.1996) (finding that, under New York law, clause stating that "any and all controversies which may arise ... concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement ... shall be determined by arbitration," was evidence that parties "clearly and unmistakably" agreed to have the arbitrator decide the question of arbitrability); *Optibase, Ltd. v. Merrill Lynch Inv. Managers*, No. 02 Civ. 9813(LTS), 2003 WL 1587244, at *4 (S.D.N.Y. Mar.27, 2003) (finding that, under New York law, clause providing that "any controversies which may arise with [Merrill Lynch]" shall be arbitrated was evidence that parties "clearly and unmistakably" agreed to have the arbitrator decide the question of arbitrability); *Nackel*, 2002 WL 31626703, at *2 (finding that, under New York law, clause that stated "[A]ny dispute, controversy or claim ... arising out of or relating to or concerning the provisions of this Agreement, any agreement between you and the Firm relating to or arising out of your employment with us or otherwise concerning any rights, obligations, or other aspects of your employment relationship" shall be arbitrated, was evidence that parties "clearly and unmistakably" agreed to have the arbitrator decide the question of arbitrability).

■ However, even if this Court were to determine that the language of the arbitration clauses did not "clearly and unmistakably" evidence an agreement to have the arbitrator decide the question of arbitrability, this Court would find that plaintiffs' claims are within the scope of the arbitration clauses. As noted above, the arbitration clauses in the First USA and BOA cardholder agreements apply to any claim "arising from or relating in any way to ... [the] Account," and "arising out of or relating to ... [the] Account," respectively. Plaintiffs' claims against First USA and BOA clearly relate to their accounts with their respective banks. First, the claims allege that unlawful currency conversion fees were charged to plaintiffs' accounts with First USA and BOA. Second, the alleged TILA violations were contained in documents and solicitations sent to plaintiffs regarding their credit card account or prospective credit card account with First USA and BOA. There is no question that these claims relate to plaintiffs' accounts at First USA and BOA.

■ The arbitration clauses involved in this action are broad. *See, e.g., ACE Capital*, 307 F.3d at 26 ("any dispute [that] shall arise between the parties ... with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" held to be broad arbitration clause); *Oldroyd*, 134 F.3d at 76 ("[a]ny dispute, controversy or claim arising under or in connection with [the agreement]" is a broad arbitration clause); *Collins & Aikman*, 58 F.3d at 19 ("Any claim or controversy arising out of or relating to th[e] agreement is a broad arbitration clause."); *Newbridge Acquisition I, L.L.C. v. Grupo Corvi, S.A. de D.V.*, No. 02 Civ. 9839(JSR), 2003 WL 42007, at *3 (S.D.N.Y. Jan.6, 2003) ("any and all disputes which may arise out of or in connec-

tion with this Agreement" is a broad arbitration clause); *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.,* 239 F.Supp.2d 332, 336 (S.D.N.Y.2002) (arbitration clause stating "any controversy or claim . . . related directly or indirectly to this Agreement" is broad). Where an arbitration clause is broad, a presumption of arbitrability arises and

> arbitration of even a collateral matter will be ordered if the claim alleged "implicates issues of contract construction or the parties' rights and obligations under it." Moreover, "[w]hen parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated, while the intended scope of a narrow arbitration clause is obviously more limited."

*ACE Capital,* 307 F.3d at 34 (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224–25 (2d Cir.2001)); *accord Specht,* 306 F.3d at 35; *Fluor Daniel,* 1999 WL 637236, at *8–9.

This presumption of arbitrability can be overcome only if it may be said with "positive assurance" that the arbitration clause is not susceptible to the interpretation that it brings plaintiffs' claims within its sweep. *Lewis Tree Serv.,* 239 F.Supp.2d at 336 (citing *Oldroyd,* 134 F.3d at 76); *accord Specht,* 306 F.3d at 35 ("[A]rbitration is indicated unless it can be said 'with positive assurance' that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute."); *Genesco,* 815 F.2d at 847 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

Here, this Court cannot say with positive assurance that the arbitration clauses at issue are not susceptible to an interpretation that plaintiffs Ruga and Ross's

claims "touch matters" within the cardholder agreements. Plaintiffs allege a conspiracy to fix currency conversion fee prices that are charged when they conduct a foreign currency transaction on their credit card. Thereafter, the alleged fixed price fees appear on plaintiffs' monthly billing statements for their credit card accounts. Further, the terms of plaintiffs' use of their credit card accounts are governed by the cardholder agreements that contain the arbitration clauses. Thus, when reading the arbitration agreements liberally, due to their broad language, the antitrust claims are related to the cardholder agreements and the plaintiffs' credit card accounts such that the claims "touch matters" covered by the cardholder agreement. Moreover, in accord with the strong federal policy favoring arbitration, this Court resolves any doubt concerning arbitrability in favor of arbitration.

### 1. *Claims Arising Prior to Contract*

■ Plaintiffs argue that they cannot be forced to arbitrate claims that arose prior to the time that the parties entered into an arbitration agreement. Specifically, plaintiffs contend that the solicitations containing the TILA violations were sent to plaintiffs prior to plaintiffs' receipt of any cardholder or arbitration agreement, and certainly prior to plaintiffs' agreement to the terms of such a provision.

However, all of plaintiffs' claims fall under the scope of the arbitration clauses at issue here. The First USA clause specifically states that the "arbitration agreement applies to all Claims now in existence or that may arise in the future." Certainly plaintiff Ruga's TILA violation claim was in existence at the time she agreed to the First USA cardholder agreement. *See Lloyd v. MBNA Am. Bank, N.A.,* No. 00 Civ. 109, 2001 WL 194300, at *4 (D.Del. Feb. 22, 2001).

Further, the BOA clause states that "[a]ny dispute, claim, or controversy ... arising out of or relating to this Agreement, your Account, or the validity or scope of any provision of this Agreement, [shall] be resolved by binding arbitration." This language is broad enough to include any TILA violation claims that plaintiff Ross had prior to his acceptance of the BOA cardholder agreement. Importantly, this Court cannot say with positive assurance that the BOA arbitration clause cannot be interpreted to include plaintiff Ross's TILA violation claims that may have arisen prior to the agreement. Thus, applying the strong policy in favor of arbitration and resolving any doubts of arbitrability in favor of arbitration, this Court finds that any TILA violations arising prior to the cardholder agreement are nonetheless within the scope of the BOA arbitration clause. *See Arriaga v. Cross Country Bank,* 163 F.Supp.2d 1189, 1192–93 & n. 6 (S.D.Cal.2001), *rejected on other grounds by Ting v. AT & T,* 319 F.3d 1126, 1150 n. 14 (9th Cir.2003) and *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1176 n. 15 (9th Cir.2003).

Accordingly, this Court finds that all of plaintiffs Ruga and Ross's claims against First USA, Bank One, BOA, and BOA Corp. are within the scope of the arbitration agreement in the plaintiffs' cardholder agreements.

### C. *Federal Statutory Claims*

Defendants argue that both plaintiffs' TILA and antitrust claims are arbitrable. Plaintiffs contend that horizontal price-fixing antitrust claims are not amenable to arbitration. For the following reasons, plaintiffs' arguments are without merit.

Notwithstanding the vital public policy purposes served by federal statutes, the Supreme Court has repeatedly acknowledged that "[i]t is by now clear that statu-tory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The Supreme Court instructs

> Although all statutory claims may not be appropriate for arbitration, "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evidenced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." In this regard, we note that the burden is on [plaintiff] to show that Congress intended to preclude a waiver of a judicial forum for [his or her statutory] claims. If such an intention exists, it will be discoverable in the text of the [statute], its legislative history, or an "inherent conflict" between arbitration and the [statute's] underlying purposes. Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."

*Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), and *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *accord Lewis Tree,* 239 F.Supp.2d at 337; *Hale v. First USA Bank, N.A.,* No. 00 Civ. 5406(JGK), 2001 WL 687371, at *7 (S.D.N.Y. June 19, 2001).

Applying such an analysis, the Supreme Court has found that claims under the Sherman Act, ADEA, RICO, the Securities Exchange Act of 1934, and the Securities Act of 1933 are arbitrable. *See, e.g., Gilmer,* 500 U.S. at 27, 111 S.Ct. 1647 (ADEA); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 482–

83, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (Securities Act of 1933); *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 225–26, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (RICO and Securities Exchange Act of 1934); *Mitsubishi,* 473 U.S. at 625, 105 S.Ct. 3346 (Sherman Act).

### 1. *TILA Claims*

██ Plaintiffs do not dispute the fact that TILA claims are arbitrable, nor could they. Numerous courts have found TILA claims to be arbitrable. *See, e.g., Randolph v. Green Tree Fin. Corp.,* 244 F.3d 814, 819 (11th Cir.2001); *Johnson v. West Suburban Bank,* 225 F.3d 366, 377–78 (3d Cir.2000); *Sagal v. First USA Bank, N.A.,* 69 F.Supp.2d 627, 631 (D.Del.), *aff'd,* 254 F.3d 1078 (3d Cir.2001); *Defreitas v. Am. Gen. Fin., Inc.,* No. 01 Civ. 2756, 2001 WL 1313203, at *3 (E.D.La. Oct.25, 2001); *Lloyd,* 2001 WL 194300, at *3; *see also Hale,* 2001 WL 687371, at *7 (collecting cases). This Court also concludes that plaintiffs' TILA claims are arbitrable.

### 2. *Horizontal Price–Fixing Claims*

In *Mitsubishi,* the Supreme Court held that Sherman Act claims of antitrust conspiracy are arbitrable. 473 U.S. at 628–40, 105 S.Ct. 3346. The Supreme Court held that "nothing in the nature of the federal antitrust laws prohibits parties from agreeing to arbitrate antitrust claims." *Shearson/Am. Express v. McMahon,* 482 U.S. 220, 239, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (citing *Mitsubishi,* 473 U.S. at 629, 105 S.Ct. 3346). The Supreme Court also found that the potential factual and legal complexities of an antitrust claim do not warrant a prohibition on antitrust arbitrations. *Mitsubishi,* 473 U.S. at 633–34, 105 S.Ct. 3346; *McMahon,* 482 U.S. at 232, 107 S.Ct. 2332. Nor does arbitration "entail any consequential restrictions on statutory rights." *McMahon,* 482 U.S. at

232, 107 S.Ct. 2332 (citing *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346).

Further, the importance of the private damages remedy in antitrust actions does not compel the conclusion that those remedies are precluded in a private arbitration. *Mitsubishi,* 473 U.S. at 634–36, 105 S.Ct. 3346. The Court noted that, "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. 3346; *accord McMahon,* 482 U.S. at 240, 107 S.Ct. 2332. Finally, the *Mitsubishi* court found that courts will remain in a position to protect a litigants' rights under the antitrust laws even after permitting arbitration since it has

the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed.... While the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them.

473 U.S. at 638, 105 S.Ct. 3346.

Although *Mitsubishi* involved an arbitration in an international transaction, the Supreme Court has not limited *Mitsubishi* to international arbitrations. For instance, it has subsequently cited *Mitsubishi* without distinguishing between domestic and international arbitrations. *See, e.g., Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79, 89, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (recognizing that Sherman Act claims can be appropriately resolved through arbitration); *Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647 (noting that the Supreme Court had previously held that "claims under [the Sherman Act] are ap-

propriate for arbitration"); *McMahon*, 482 U.S. at 239–41, 107 S.Ct. 2332 (noting that *Mitsubishi* addressed international transactions only, but applying the *Mitsubishi* analysis to arbitration of RICO claims since they are "no different from the federal antitrust laws," without distinguishing between domestic and international antitrust claims).

Further, courts in this district have held that *Mitsubishi* and its reasoning apply to domestic as well as international arbitrations. *See, e.g., Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 757 F.Supp. 283, 286 (S.D.N.Y.) ("[T]he reasoning of *Mitsubishi* should apply with equal force to domestic claims."), *aff'd*, 946 F.2d 883 (2d Cir.1991); *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 671 F.Supp. 972, 979 (S.D.N.Y.1987) ("Although the holding of Mitsubishi was limited to international transactions, we believe that this reasoning would apply with equal force in the domestic context."); *see also Acquaire v. Canada Dry Bottling*, 906 F.Supp. 819, 837 (E.D.N.Y.1995) ("Significantly, the reasoning applied by the [*Mitsubishi* ] Court . . . is as relevant to arbitration agreements of national scope as it is to agreements between international partners.") Thus, these courts have necessarily found that the doctrine enunciated in *American Safety Equipment Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826–27 (2d Cir.1968), which held that antitrust claims were not subject to involuntary arbitration, was effectively overruled. *See Hough*, 757 F.Supp. at 286; *Gemco*, 671 F.Supp. at 980; *see also Seacoast Motors of Salisbury, Inc. v. DaimlerChrysler Motors Corp.*, 271 F.3d 6, 10 (1st Cir.2001) (finding that since *Mitsubishi*, circuit courts have "abandoned the *American Safety* doctrine

in its entirety"); *Acquaire*, 906 F.Supp. at 837 ("Since the *Mitsubishi* decision was issued a number of district courts in this circuit have held that domestic antitrust disputes are arbitrable. I find no reason to conclude otherwise with respect to the instant antitrust claims.").

Plaintiffs contend that horizontal price-fixing antitrust claims, such as those alleged by plaintiffs, are not arbitrable. Plaintiffs rely mainly on *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir.1995), to support their argument. However, *Coors* does not stand for the broad proposition advanced by plaintiffs.[5]

In *Coors*, the Tenth Circuit did not hold that there was a blanket prohibition on the arbitration of horizontal price-fixing claims, but only that the arbitration agreement at issue in that case "cover[ed] antitrust disputes . . . provided that those disputes are within the scope of the agreement." 51 F.3d at 1515–16 ("Although *Mitsubishi* allowed parties to a contract to compel the arbitration of their antitrust disputes, it did not proclaim that all disputes between parties who include an arbitration clause in their contracts are subject to arbitration. A dispute within the scope of the contract is still a condition precedent to the involuntary arbitration of antitrust claims."). The court then went on to find that the particular antitrust claims in that action were outside the scope of the arbitration clause. *Coors*, 51 F.3d at 1515–16. The arbitration clause in *Coors* mandated arbitration of "any dispute arising in connection with the implementation, interpretation or enforcement" of the contract between the parties. 51 F.3d at 1515. However, "[t]hat language was not broad enough to cover antitrust claims, the Tenth Circuit

---

**5.** Plaintiffs' argument also ignores the fact that other courts have found claims alleging horizontal price-fixing claims to be subject to

arbitration. *See, e.g., Acquaire*, 906 F.Supp. at 836–37; *Gemco*, 671 F.Supp. at 978–80.

held, except with respect to antitrust disputes that were within the scope of the parties' licensing agreement, that is claims where there was a 'connection between the contract and the antitrust claims.'" *B–S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 229 F.Supp.2d 1209, 1227 (D.Kan. 2002) (quoting *Coors*, 51 F.3d at 1516).

█ In contrast, the arbitration clauses at issue here are quite broad in that they apply to any claim "arising from or relating in any way to . . . your Account," and "arising out of or relating to . . . your Account." As previously discussed, after applying the strong policy in favor of arbitration, and resolving any doubts in favor of arbitrability, it is clear that plaintiffs' antitrust claims "touch matters" covered by the cardholder agreements plaintiffs entered into. Plaintiffs allege a conspiracy to fix currency conversion fee prices that are charged when they conduct a foreign currency transactions with their credit cards, and the alleged fixed price fees appear on plaintiffs' credit card accounts. The terms of plaintiffs' use of those credit card accounts are governed by the cardholder agreements containing the arbitration clause. Thus, the antitrust claims are related to the cardholder agreements and the plaintiffs' credit card accounts such that the claims "touch matters" covered by the cardholder agreement.[6]

Further, this Court does not share the *Coors* concern over a result that compels arbitration. The Tenth Circuit noted that such an outcome would lead to the anomaly that *"every brewer in America* except Coors may bring an antitrust action

against Molson." *Coors*, 51 F.3d at 1516 (emphasis in original). The decision to compel arbitration in this action will lead to the anomaly envisioned by the Tenth Circuit, but that is precisely what the parties bargained for. Indeed, every credit card holder in America, or at least those cardholders of the alleged co-conspirators of defendants First USA, Bank One, BOA and BOA Corp., can bring an antitrust action against those defendants. However, plaintiff Ruga, and other similarly situated First USA cardholders, cannot sue First USA and Bank One because they bargained away their right to bring an action in federal court by agreeing to arbitration. The same is true for plaintiff Ross, and other similarly situated BOA cardholders, with respect to BOA and BOA Corp. This result is not bizarre. In fact, logic compels it because one of the prices of doing business with First USA and BOA is an agreement to arbitrate. Plaintiffs Ruga and Ross decided to agree to arbitration instead of taking their business to another credit card issuer. When the outcome is the product of the parties' bargain with each other, such a result cannot be characterized as "absurd."

### D. *Enforcement*

Apart from the arbitrability of their claims, plaintiffs argue that the First USA and BOA arbitration clauses are unenforceable. Plaintiffs advance several arguments for unenforceability, but each is without merit.

---

**6.** Plaintiffs' reliance on *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999), is equally misplaced. In *AlliedSignal*, the Seventh Circuit unremarkably held that the claim in that case was not subject to arbitration because it was outside the scope of the arbitration clause in the agreement between the parties. 183 F.3d at 572–73. As one court has already noted, *"AlliedSignal* must be confined to its facts." *LCA, Inc. v. Sharp Elec. Corp.*, No. 00–3283, 2000 WL 1222044, at *3 (N.D.Ill. Aug.22, 2000). Further, as noted above plaintiffs' antitrust claims in this action are within the scope of the arbitration clauses at issue here.

### 1. *Unconscionability*

■ Section Two of the FAA provides that arbitration agreements shall be enforced subject to all defenses to enforcement that apply to contracts generally. 9 U.S.C. § 2. To determine the merit of these contractual defenses, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944, 115 S.Ct. 1920. However, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree*, 531 U.S. at 91, 121 S.Ct. 513.

■ Plaintiffs argue that the First USA and BOA arbitration clauses are unconscionable, and thus unenforceable. Specifically, they contend that the costs to bring an arbitration action discourage or prevent plaintiffs from vindicating their statutory rights.[7] "It may well be that the existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights in the arbitral forum." *Green Tree*, 531 U.S. at 90, 121 S.Ct. 513; *accord Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 56 (1st Cir.2002). Specifically, "where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree*, 531 U.S. at 92, 121 S.Ct. 513.

The Supreme Court did not determine "[h]ow detailed the showing of prohibitive

expense must be before the party seeking arbitration must come forward with contrary evidence." *Green Tree*, 531 U.S. at 92, 121 S.Ct. 513. However, it did hold that the mere risk of such prohibitive costs is too speculative to justify invalidating the arbitration agreement. *See Green Tree*, 531 U.S. at 91, 121 S.Ct. 513; *Large*, 292 F.3d at 56.

■ This Court agrees with District Judge Kaplan, in *Stewart v. Paul, Hastings, Janofsky & Walker, LLP*, 201 F.Supp.2d 291, 293 (S.D.N.Y.2002), that the proper inquiry is the one adopted by the Fourth Circuit in *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 553–57 (4th Cir.2001). There the Fourth Circuit held that a "case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether the cost differential is so substantial as to deter the bringing of claims" is appropriate. *Bradford*, 238 F.3d at 556; *accord Stewart*, 201 F.Supp.2d at 293 (labeling the *Bradford* opinion "meticulously reasoned"); *see also Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1259 (11th Cir.2003) ("Since *Green Tree*, all but one of the other Circuits that have reconsidered this issue have applied a similar case-by-case approach.").

■ As an initial matter, defendants have offered to pay all arbitration fees,

---

7. Plaintiffs' suggestion that the arbitration clauses at issue here are unconscionable because they appear in "pre-printed forms" and are allegedly in "fine print," are without merit. The use of pre-printed forms does not convert an otherwise valid contract into an unconscionable contract. *See Bischoff v. DirecTV, Inc.*, 180 F.Supp.2d 1097, 1105 (C.D.Cal.2002); *Lloyd v. MBNA America Bank, N.A.*, No. 00 Civ. 109, 2001 WL 194300,

at *4 (D.Del. Feb. 22, 2001). Further, the arbitration clauses in this action are not in "fine print" and include "block-capitalized warnings" to setoff the arbitration clause from the rest of the agreement. Thus, they are not unconscionable. *See Bank One, N.A. v. Coates*, 125 F.Supp.2d 819, 831 (S.D.Miss.), *aff'd*, 34 Fed. Appx. 964 (2002); *Dorsey v. H.C.P. Sales, Inc.*, 46 F.Supp.2d 804, 808 (N.D.Ill.1999).

hearing fees, and arbitrators' fees, and to forgo any right to seek prevailing party attorneys' fees in arbitration. Thus, plaintiffs cannot possibly show that the arbitration costs could preclude them from effectively vindicating their federal statutory rights in arbitration. *See Large*, 292 F.3d at 56–57; *Arellano v. Household Finance Corp. III*, No. 01–2433, 2002 WL 221604, at *3 (N.D.Ill. Feb.13, 2002); *see also Dobbins v. Hawk's Enters.*, 198 F.3d 715, 717 (8th Cir.1999) (directing district court that if the arbitration fee is unreasonable, then the district court should accept defendant's offer to pay the arbitration fees); *Howard v. Anderson*, 36 F.Supp.2d 183, 187 (S.D.N.Y.1999) (noting that where courts have found that fees render an arbitration agreement unenforceable, "courts have either refused to enforce the arbitration agreement or ordered the defendant to pay the fees").

Even if defendants had not offered to pay the arbitration fee and waive any fee-shifting rights they may have, the costs required to bring an arbitration do not render the First USA and BOA arbitration agreements unconscionable.

The First USA arbitration agreement identifies the National Arbitration Forum ("NAF") as its arbitration forum. (Barrett Decl. Ex. 1.) Under the current NAF Code, plaintiffs' claims would be considered "Consumer Small Claims." (Second Decl. of Joshua Wolson dated May 23, 2002, ("Wolson Decl. II"), Ex. B ("NAF Code"), Rule 2(BB); Wolson Decl. II Ex. A.) Such claims are subject to a different fee schedule than other claims submitted to NAF. (Wolson Decl. II, NAF Code at 38.) Under the NAF Code, a plaintiff filing a "Consumer Small Claim" is subject to a filing fee ranging from $40 to $100, and a Participatory Hearing Fee ranging from $75 to $100. However, the respondent is required to pay the remaining hearing fees for the hearing, except for a $10 processing fee per so-called "Request."[8] (Wolson Decl. II, NAF Code at 39–40.) Moreover, the NAF Code provides for a waiver of the Small Claim filing fee, administrative fees, Request fees, or Hearing fees for indigent parties. (Wolson Decl. II, NAF Code Rule 45(A).)

This fee schedule in the NAF Code has been upheld as adequate and fair by numerous courts. *See, e.g., Hale v. First USA Bank, N.A.*, No. 00 Civ. 5406(JGK), 2001 WL 687371, at *4 (S.D.N.Y. June 19, 2001) (collecting cases). In *Green Tree*, Justice Ginsburg, in a separate opinion, concurring in part and dissenting in part, characterized the NAF Code provisions limiting fees in consumer small claims cases as a "model[ ] for fair cost and fee allocation." *Green Tree*, 531 U.S. at 95 & n. 2, 121 S.Ct. 513; *accord Hale*, 2001 WL 687371, at *4 n. 2. This Court agrees. Further, plaintiff Ruga has failed to demonstrate an inability to pay the NAF fees, nor has she demonstrated that those fees are so substantially different than the fees a litigant would pay in federal court that they deter her from bringing claims. *See Hale*, 2001 WL 687371, at *3–4.[9]

The BOA arbitration agreement identifies Judicial Arbitration and Mediation Services, Inc. ("JAMS") as the forum for

---

8. The Requests listed in the NAF Code include, *inter alia,* requests for amendment, subpoena, discovery order, and continuance. (Wolson Decl. II, NAF Code at 40.)

9. Plaintiffs' argument that the NAF Code unreasonably subjects them to a "loser pays" cost-shifting provision is unavailing. The applicable NAF Code only permits an award of fees and costs in favor of a party as permitted by law. (Wolson Decl. II, NAF Code Rule 37(C).) Thus, plaintiffs are in no worse a position under the NAF Code then they would be in federal court.

the arbitration. (Uhlig Decl. Ex. 2.) Under the JAMS "Minimum Standards of Procedural Fairness" applicable to consumer arbitrations, "when a consumer initiates arbitration against the company, the only fee required to be paid by the consumer is $125, which is approximately equivalent to current Court filing fees. All other costs must be borne by the company ...." (Decl. of William R. Wade–Grey dated May 22, 2002, ("Wade–Grey Decl.") Appx. ¶ 7.) This is precisely the situation with plaintiff Ross's claims. He has not demonstrated an inability to pay the $125 fee associated with a JAMS arbitration, nor has he shown that that fee would effectively deter him from vindicating his statutory rights. *See Hale,* 2001 WL 687371, at *3–4.

However, the BOA arbitration clause does contain a clause of some concern in consumer arbitrations, namely that "[i]f the arbitrator rules in favor of one party against the other, the other party shall pay all reasonable attorneys' fees and costs of the action on behalf of both parties (including any fees and expenses paid by one party on behalf of the other) unless the arbitrator or court decides such an award would cause a substantial injustice based on the facts and legal arguments set forth in the action." (Uhlig Decl. Ex. 2.) Notably, the agreement prohibits an award of fees and costs where either the arbitrator or court decided that "such an award would cause a substantial injustice." Thus, plaintiff Ross has failed to demonstrate the likelihood of the application of such a fee shifting provision, and has only shown that he faces a risk that the fee-shifting provision in the BOA arbitration agreement would be applied. *See Musnick,* 325 F.3d at 1259–60 (holding that where an arbitration agreement contains a "loser pays" provision that may involve

some "fee-shifting," the claim of prohibitive costs is too speculative); *Thompson v. Irwin Home Equity Corp.,* 300 F.3d 88, 91–92 (1st Cir.2002) (same). The mere risk of such prohibitive costs is too speculative to justify invalidating the arbitration agreement. *See Green Tree,* 531 U.S. at 91, 121 S.Ct. 513; *Musnick,* 325 F.3d at 1259–60; *Large,* 292 F.3d at 56.

Moreover, even if an issue should arise during arbitration concerning fees imposed on plaintiffs, it can be addressed adequately by the Court at the arbitration award enforcement stage. Thus, plaintiffs are not left without recourse if they believe that they were not able to vindicate all their statutory rights in arbitration due to costs or fees imposed on them. *See Musnick,* 325 F.3d at 1261; *Thompson,* 300 F.3d at 92; *Howard v. Anderson,* 36 F.Supp.2d 183, 187 (S.D.N.Y.1999); *see also McMahon,* 482 U.S. at 232, 107 S.Ct. 2332 (finding that judicial review at the enforcement stage ensures compliance with statutory requirements); *DeGaetano v. Smith Barney, Inc.,* 983 F.Supp. 459, 464–5 (S.D.N.Y.1997) (vacating arbitration award because arbitration agreement was against public policy to the extent that it prevented prevailing plaintiff from obtaining an award of attorney's fees in an employment discrimination case, a right plaintiff has under Title VII).

Accordingly, this Court finds that plaintiffs have not demonstrated sufficiently an inability to pay the fees associated with the arbitrations called for under their cardholder agreements, nor the likelihood that they would incur large arbitration costs that would effectively preclude them from vindicating their federal statutory rights in arbitration. Thus, this Court will not invalidate the arbitration agreements as unconscionable.[10]

---

**10.** Plaintiffs' remaining arguments that the

First USA and BOA arbitration clauses are

### 2. Seventh Amendment Right to Jury Trial

██ Plaintiffs also argue that arbitration in this case would violate their Seventh Amendment right to a jury trial. Plaintiffs' argument is without merit. A plaintiff is deemed to have forgone the right to a jury trial under the Seventh Amendment as a result of entering into an agreement to arbitrate certain matters. As the Fourth Circuit held,

> [T]he fact that the appellees waived their right to a jury trial does not require the court to evaluate the agreement to arbitrate under a more demanding standard. It is clear that a party may waive her right to adjudicate disputes in a judicial forum. Similarly, the right to a jury trial attaches in the context of judicial proceedings after it is determined that litigation should proceed before a court. Thus, the "loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate."

*Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 307 (4th Cir.2001) (quoting *Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir.1984)); *accord Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir.2002); *Bank One, N.A. v. Coates*, 125 F.Supp.2d 819, 834 (S.D.Miss.2001); *see also Marsh v. First USA Bank, N.A.*, 103 F.Supp.2d 909, 920–22 (N.D.Tex.2000) ("The Seventh Amendment right to a trial by jury is necessarily incident to, and predicated upon the right to a federal judicial forum. Thus, a valid arbitration provision, which waives the right to resolve a dispute through litigation in a judicial forum, implicitly waives the attendant right to a jury trial. Therefore, the Seventh Amendment is not implicated by a contractual provision that precludes access to an Article III forum.").

Plaintiffs' reliance on *National Equipment Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir.1977) and *Wright v. Lewis*, 76 F.3d 57, 59 (2d Cir.1996), is misplaced. Neither *National Equipment* nor *Wright* involved arbitration, and both assumed the plaintiff in each respective case had a right to proceed before a court. Thus, the *National Equipment* and *Wright* courts found that the plaintiffs' right to a jury trial under the Seventh Amendment had already attached. *See Wright*, 76 F.3d at 59–60; *Nat'l Equipment*, 565 F.2d at 258. In contrast, plaintiffs' right to a jury did not attach here because they waived their right to proceed before a court.[11]

### 3. Procedural Limitations & Lack of Injunctive Relief

Finally, plaintiffs argue that their statutory right to injunctive relief under both

---

unconscionable are also without merit. The First USA arbitration clause's alleged one-sided "carve-out" is not unconscionable under Delaware law. *See Hale*, 2001 WL 687371, at *4–7 (holding that an identical arbitration clause was not unconscionable under Delaware law). Similarly, the BOA arbitration clause's alleged one-sided "carve-out" does not make the arbitration agreement unenforceable under Arizona law. *See Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*, 995 F.Supp. 1060, 1066–67 (D.Ariz.1997) (holding that clause permitting defendant to unilaterally chose between two alternative dispute resolution mechanisms is enforceable under Arizona law).

**11.** Plaintiffs further argue that compelling arbitration in this case would require the Court to "splinter" proof in a manner that contravenes the Seventh Amendment. Plaintiffs cite no case authority for their position and this Court has found none. An issue of splintering proof in violation of the Seventh Amendment does not arise in this case because the claims litigated in federal court will be between different parties than the claims litigated in the arbitration.

the antitrust laws and TILA will be frustrated in arbitration. Further, they assert that their rights to certain discovery mechanisms, subpoena powers, and to proceed against all the alleged co-conspirator defendants in one forum are impaired by arbitration. These policy arguments against arbitration lack merit.

Plaintiffs' arguments concerning discovery, subpoena powers, and their right to proceed against all co-conspirators in one forum have all been resolved in favor of arbitration and this Court will not revisit such unfounded arguments. *See, e.g., Chisolm v. Kidder Peabody Asset Mgmt., Inc.,* 966 F.Supp. 218, 222 (S.D.N.Y.1997) ("Unfairness due to limited discovery has also been dismissed by the Court because, 'though the procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality and expedition of arbitration.'" (quoting *Gilmer,* 500 U.S. at 31–32, 111 S.Ct. 1647)).[12] "Such generalized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'" *Gilmer,* 500 U.S. at 30, 111 S.Ct. 1647 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

Plaintiffs further argue that arbitration in this action would not permit them to exercise certain statutory rights under the antitrust laws and TILA. Specifically, plaintiffs argue that the arbitration clauses effectively foreclose the statutory right of injunctive relief, which plaintiffs contend is provided to protect not only private plaintiffs, but competition and the public.

As discussed above, the Supreme Court has held that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. 3346; *accord Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647. The Court has also made clear that "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. 3346; *accord Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647.

▬ Here, under the rules of NAF and JAMS, any relief available under the applicable substantive law, including injunctive relief, is available in arbitration as well. (JAMS Rule 22(d); Wolson Decl. II NAF Code Rule 20D.) Thus, injunctive relief will be available to plaintiffs Ruga and Ross against the defendants in the arbitration, as it was available to the plaintiff in *Gilmer.* Further, injunctive relief against the remaining co-conspirators will also be available to plaintiffs Ruga and Ross, since their claims against the other co-conspirators remain here. Therefore, plaintiffs have the ability to obtain injunctive relief against all defendants.[13]

---

**12.** Notably, plaintiffs cite no authority for their proposition that arbitration should be denied where plaintiffs cannot effectively and efficiently proceed against all defendants in a single proceeding. Nor does this Court find any support for such a contention.

**13.** The cases that plaintiffs cite for support are inapposite. Specifically, *Broughton v. Cigna Healthplans of Cal.,* 21 Cal.4th 1066, 90 Cal.Rptr.2d 334, 988 P.2d 67 (1999), upon which plaintiffs heavily rely, involves a statute

Accordingly, this Court finds that the arbitration clauses in the First USA and BOA cardholder agreements are enforceable against plaintiffs Ruga and Ross, and their antitrust and TILA claims against First USA, Bank One, BOA, and BOA Corp. should proceed in arbitration.

### E. *Stay*

Section three of the FAA provides that a district court, upon determining that an action before it is subject to an enforceable arbitration provision, "shall ... stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. As this Court has found that all the claims by plaintiffs Ruga and Ross against defendants First USA, Bank One, BOA and BOA Corp. are subject to mandatory arbitration, the action by those plaintiffs against those defendants is stayed pending arbitration.

Accordingly, this Court grants defendants First USA and Bank One's motion to stay plaintiff Ruga's claims against them and compel plaintiff Ruga to bring those claims in arbitration in compliance with the agreement between the parties. Further, defendants BOA and BOA Corp.'s motion to stay plaintiff Ross's claims against them is granted and this Court compels plaintiff Ross to bring those claims in arbitration as well.

## II. *Motion to Dismiss*

On a motion to dismiss, a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). In this limited task, the "issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether she is entitled to offer evidence in support of the allegations in the complaint." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 62 (2d Cir.1997).

■■■ "This generous approach to pleading applies in the antitrust context." *Hamilton College*, 128 F.3d at 63. As such, there are no heightened pleading requirements for antitrust cases. *See Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir.2001); *Dresses For Less, Inc. v. CIT Group/Commercial Servs., Inc.*, No. 01 Civ. 2669(WHP), 2002 WL 31164482, at *6 (S.D.N.Y. Sept.30, 2002). Further, "[i]n antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir.1998) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)); *accord Todd*, 275 F.3d at 198; *Dresses For Less*, 2002 WL 31164482, at *6.

The Second Circuit has held that "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554 (2d Cir.1977); *accord In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 185 (S.D.N.Y.2000). How-

unique to California, and is thus irrelevant here.

ever, it is "improper 'to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.' " *Todd,* 275 F.3d at 198 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)); *accord Dresses For Less,* 2002 WL 31164482, at *6.

### A. *Sherman Act Section One Claims*

In Counts I through III plaintiffs allege three different conspiracies that violate Section One of the Sherman Act. In Count I, plaintiffs allege that VISA, in conjunction with its member banks, MasterCard, in conjunction with its member banks, and Diners Club conspired to fix a minimum currency conversion fee of 1%. In Count II, plaintiffs allege that VISA and its member banks conspired with each other to fix a minimum currency conversion fee of 1%, and facilitate the second tier fees. Count III is identical to Count II, except that it alleges MasterCard and its member banks were the co-conspirators.

#### 1. *Inter–Association Claim*

■■■ Section One of the Sherman Act prohibits all combinations and conspiracies that unreasonably restrain trade among the states. 15 U.S.C. § 1. "To withstand a motion to dismiss, the plaintiff in a Sherman Act Conspiracy claim must allege (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce." *In re Nasdaq Market–Makers Antitrust Litig.,* 894 F.Supp. 703, 710 (S.D.N.Y.1995); *accord Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir.2001); *Tops Mkts., Inc., v. Quality Mkts., Inc.,* 142 F.3d 90, 96 (2d Cir.1998); *In re Magnetic Audiotape Antitrust Litig.,* No. 99 Civ. 1580, 2002

WL 975678, at *4 (S.D.N.Y. May 9, 2002). "The complaint 'must identify the co-conspirators, and describe the nature and effects of the alleged conspiracy.' " *Nine West,* 80 F.Supp.2d at 192 (quoting *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.,* 994 F.Supp. 133, 138 (S.D.N.Y.1998)). Further, an antitrust complaint must adequately define the relevant product market, and allege antitrust injury and conduct in violation of the antitrust laws. *Nine West,* 80 F.Supp.2d at 185; *Rock TV Entm't, Inc. v. Time Warner, Inc.,* No. 97 Civ. 0161(LMM), 1998 WL 37498, at *2 (S.D.N.Y. Jan.30, 1998).

■■■ A district court must determine whether the complaint "contains either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Continental Orthopedic,* 994 F.Supp. at 138; *accord Nine West,* 80 F.Supp.2d at 192. However, "[a]lthough the Federal Rules permit statements of ultimate facts, a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal." *Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir. 1972).

Defendants assert that Count I must be dismissed because plaintiffs failed to properly allege any concerted action. Outside of conclusory allegations that merely recite the language of the Sherman Act, defendants argue that plaintiffs have not alleged an express agreement among the defendants to fix currency conversion fees. Defendants also contend that an agreement among the defendants cannot be inferred reasonably from the limited facts plaintiffs allege. Specifically, defendants argue that: (1) MasterCard's alleged response to VISA's pre-implementation announcement of its currency conversion fee is insuffi-

418

cient to infer an inter-association conspiracy; and (2) the alleged "dual governance" of VISA and MasterCard by the member banks is insufficient to infer a conspiracy.

With respect to MasterCard's response to VISA's announcement, defendants argue that plaintiffs have alleged nothing more than parallel conduct of two competitors. And with respect to the "dual governance," i.e. the fact that the same banks allegedly control both VISA and Master-Card, defendants argue that the Complaint merely alleges an opportunity to conspire or agree.

"The plaintiff must do more than allege the existence of a conspiracy—it must allege some facts in support of the claim." *Floors–N–More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 501 (S.D.N.Y. 2001); *accord Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988) (dismissing complaint which alleged that the defendants "conspired and contracted with [each other] ... to restrain trade"). Moreover, the "mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,* 996 F.2d 537, 545 (2d Cir.1993); *accord AD/SAT v. Associated Press,* 181 F.3d 216, 234 (2d Cir. 1999) (holding that to prove an antitrust violation "an antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective").

■ However, "[i]t is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to this agreement." *Ambook Enters. v. Time, Inc.,* 612 F.2d 604, 614 (2d Cir.1979); *accord Nas-*

*daq,* 894 F.Supp. at 713. Thus, a complaint will withstand scrutiny on a motion to dismiss if it alleges facts that could support an inference of an unlawful agreement. An inference of a horizontal price-fixing agreement can be drawn in the absence of direct "smoking gun" evidence "when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices. Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd,* 275 F.3d at 198 (citations omitted); *accord Apex Oil Co. v. DiMauro,* 822 F.2d 246, 254 (2d Cir.1987); *Nasdaq,* 894 F.Supp. at 713.

■ Conscious parallelism in pricing is one such circumstance that can provide for an inference of an antitrust conspiracy. *Apex,* 822 F.2d at 254; *Nasdaq,* 894 F.Supp. at 713. The Second Circuit has held that to infer a conspiracy from parallel pricing "a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction[ ] with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex,* 822 F.2d at 253–54; *accord Nasdaq,* 894 F.Supp. at 713. " 'Plus factors' identified by courts, which, in combination with parallel pricing, may support an inference of conspiracy, include a common motive to conspire, actions which were against [the conspirators'] own individual business interests absent an illicit agreement, and evidence of coercion." *Nasdaq,* 894 F.Supp. at 713–14 (collecting cases). The Second Circuit has also found that "a high level of interfirm communications" is an additional "plus factor." *Apex,* 822 F.2d at 253–54; *accord In re Plywood Antitrust Litigation,* 655 F.2d 627, 633–37 (5th Cir.1981).

At the motion to dismiss stage, the complaint must merely allege the "legal and factual theory upon which [the] claim of interdependent conscious parallelism rests." *Nasdaq,* 894 F.Supp. at 714 (quoting *Levitch v. Columbia Broad. Sys., Inc.,* 495 F.Supp. 649, 675 (S.D.N.Y.1980)). Thus, viewing the Complaint liberally and as a whole, plaintiffs have alleged sufficient facts to permit a fact-finder to infer that the defendants conspired to set the prices of currency conversion fees as alleged in Count I. Specifically, plaintiffs have alleged that defendants have acted in a parallel fashion, namely that shortly after VISA announced its intention to impose a currency conversion fee, Master-Card changed its original plans for a smaller fee and decided to charge the same amount as VISA. (Compl.¶ 110.) According to plaintiffs, defendants charge a minimum 1% currency conversion fee and also impose an additional second tier fee at a higher rate. (Compl.¶¶ 91, 101, 102, 106, 123, 124.) Though this parallel pricing is not enough on its own to infer an antitrust conspiracy, plaintiffs have also alleged socalled plus factors that require the motion to dismiss be denied.

First, plaintiffs allege that, absent collusion and a common motive to conspire, the Issuing Bank defendants' imposition of the second tier fee is against their economic self-interest because they would stand to lose some of their best customers. (Compl.¶ 119.) The Complaint also alleges that Diners Club's imposition of its currency conversion fee is against its economic self-interest because it risks losing some of its customers as well. (Compl.¶ 124.)

Second, and more importantly, plaintiffs allege that the effective control that the member banks of VISA and MasterCard have over both the VISA and MasterCard associations facilitates the conspiracy. (Compl.¶¶ 91–96, 109.) This "dual governance," as it has been referred to, as well as the common issuance of VISA and MasterCard branded cards by the member banks, provides the vehicle for the interfirm communication necessary to create, fix, and maintain the currency conversion fees. (Compl.¶¶ 91, 109.) In fact, plaintiffs quote a MasterCard official's letter to the Justice Department stating that "when one board acts with respect to a matter, the results of those actions are disseminated to the members which are members in both organizations. As a result, each of the associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment." (Compl.¶ 97.)

The dual governance and parallel pricing create sufficient circumstances for an inference of an antitrust conspiracy and overcome the minimum requirements of Rule 8 notice pleading. *See Todd,* 275 F.3d at 198; *Nasdaq,* 894 F.Supp. at 714; *see also Apex,* 822 F.2d at 253–54 (noting that "common motive to conspire" and "a high level of interfirm communications" are appropriate plus factors).

The gravamen of defendants' argument is that no reasonable inference of a conspiracy to fix currency conversion fees can be inferred from the limited facts that plaintiffs allege in Count I. Defendants essentially argue that the Court should adopt the inferences that they believe should be drawn and provide alternative, lawful explanations for their conduct. "While these contentions may supply the grounds for a motion for summary judgment, they are out of place in a motion to dismiss." *Nasdaq,* 894 F.Supp. at 714.

Further, defendants' argument that inferences of conspiracy should not be drawn from the facts alleged in the Complaint because those inferences are economically implausible is misplaced at this stage.

"Even if the scheme alleged was economically implausible, a conspiracy may nevertheless be proven 'by strong direct or strong circumstantial evidence, [although] the implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence.' " *Dresses For Less,* 2002 WL 31164482, at *8 (quoting *Apex Oil,* 822 F.2d at 253 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))).

Whether plaintiffs can prove any antitrust violations based on the facts alleged in the Complaint is of no consequence. "The alleged facts, viewed as a whole, provide [a] sufficient basis from which all the elements in plaintiffs' Section 1 ... claim[] can be inferred and constitutes adequate notice to the defendants. The discovery process will provide 'whatever additional sharpening of the issues is necessary.' " *Three Crown Ltd. P'ship v. Caxton Corp.,* 817 F.Supp. 1033, 1047–48 (S.D.N.Y.1993) (quoting *George C. Frey Ready–Mixed,* 554 F.2d at 554).

#### a. *Diners Club*

The Citigroup defendants filed a separate brief to argue that Count I should be dismissed as to defendant Diners Club. They argue that plaintiffs have failed to allege that Diners Club was part of any conspiracy, and thus the claim against it should be dismissed.

■ As noted above, an allegation of an express agreement among the co-conspirators is not necessary. The complaint need only allege a factual circumstance to infer an antitrust conspiracy. *Ambook,* 612 F.2d at 614; *accord Nasdaq,* 894 F.Supp. at 713.

■ Here, plaintiffs have alleged that Diners Club, like the VISA and MasterCard defendants and their respective member banks, imposed a minimum currency conversion fee of 1%, and now impose a fee of at least 2%. (Compl.¶¶ 122–23.) Further, plaintiffs allege that the imposition of this fee by Diners Club is against its individual economic self-interest absent collusion with the VISA and MasterCard defendants and their respective member banks. (Compl.¶ 124.) Plaintiffs also allege that Citigroup's indirect ownership of Diners Club and Citibank, another Citigroup subsidiary, facilitated the conspiracy between Diners Club and VISA and MasterCard. (Compl.¶ 123.) Again, when the Court reads the Complaint liberally and as a whole, as it must, these allegations suffice to survive a motion to dismiss. The allegations in the Complaint sufficiently plead facts to create circumstances giving rise to an inference of an antitrust conspiracy. *See Nasdaq,* 894 F.Supp. at 713–14; *Three Crown,* 817 F.Supp. at 1047–48.

#### 2. *Intra–Association Claims*

■ Counts II and III allege so-called "intra-association" antitrust conspiracies between VISA and its member banks, and MasterCard and its member banks, respectively. As they did with Count I, defendants argue that Counts II and III must be dismissed because plaintiffs failed to properly allege any concerted action among the respective associations and their member banks. Specifically, defendants argue that the first tier fee set by VISA and MasterCard cannot be the basis for an antitrust conspiracy because VISA and MasterCard must be treated as autonomous entities acting unilaterally in their self-interest. Defendants also argue that the second tier fee cannot be the basis for an intra-association conspiracy since plaintiffs only allege that VISA and MasterCard "facilitate and encourage" the "collection" of that fee, and have aided and abetted that process. Those allegations,

defendants argue, are too vague to withstand a motion to dismiss.

Defendants maintain that VISA and MasterCard's conduct with respect to the first tier fee is not a proper predicate for an intra-association conspiracy. They contend that the respective associations should be treated as single entities, like their competitors American Express and Diners Club. Defendants principally rely on *AD/SAT*, 181 F.3d 216 (2d Cir.1999), *United States v. Visa U.S.A., Inc.,* 163 F.Supp.2d 322, 345 (S.D.N.Y.2001), and *National Bancard Corp. v. VISA U.S.A., Inc.,* 779 F.2d 592 (11th Cir.1986), to support their argument. These decisions rendered with the benefit of a full evidentiary record, do not compel dismissal on a motion addressed to the sufficiency of this Complaint.

Notably, in *United States v. Visa U.S.A., Inc.,* District Judge Jones held,

> antitrust law's concern with the free working of the competitive process applies with equal force to joint ventures. Although a joint venture may involve aspects of agreement among competitors to enable a joint venture to function, agreements among those competitors unrelated to the efficiency of the joint venture and in particular limiting competition in areas where the competitors should compete, are subject to scrutiny under the antitrust laws.

163 F.Supp.2d at 345; *accord Master-Card Int'l, Inc. v. Dean Witter,* No. 93 Civ. 1478(LJF), 1993 WL 338213, at *3 (S.D.N.Y. Aug.27, 1993) ("The fact that the Member banks who are controlling members of MasterCard may be acting as a 'single entity' does not immunize them from § 1 scrutiny."). Defendants repeatedly ignore plaintiffs' express allegation that "[i]mposition of the currency conversion fee is not necessary to the operation of the VISA and MasterCard networks nor to the provision of foreign exchange services on credit card transactions." (Compl.¶ 111.) The Complaint also alleges that the imposition of the fee is not necessary to the existence of foreign currency transactions. (Compl.¶ 111.) Further, plaintiffs contend that the member banks that make up VISA and MasterCard are direct horizontal competitors in every aspect except currency conversion fees. (Compl.¶¶ 105–06.) These specific allegations prevent dismissal of the claims at this stage.

Defendants also argue that plaintiffs' allegations regarding the second tier fee are vague. However, antitrust claims are not subject to a heightened pleading requirement, and therefore defendants' argument misses the mark. The allegations must merely provide a short plain statement of a claim for relief which gives notice to the opposing party. *See In re Magnetic Audiotape Antitrust Litig.,* No. 99 Civ. 1580(LMM), 2002 WL 975678, at *5 (S.D.N.Y. May 9, 2002).

Further, in Counts II and III, plaintiffs allege that each respective association and its member banks agreed to fix a currency conversion fee of no less than 1% of the transaction amount, and they conspired to facilitate and encourage the imposition and collection of the second tier fee. (Compl.¶¶ 164–65.) VISA and Master-Card's role in this conspiracy was to aid and abet the process of collecting the fees by adding the second tier fee onto the transaction amount at the network level during the conversion. (Compl.¶ 118.)

As previously noted, a complaint may infer an antitrust conspiracy where "a concert of action is contemplated and that the defendants conformed to this agreement." *Ambook,* 612 F.2d at 614; *accord Nasdaq,* 894 F.Supp. at 713. Further, at the motion to dismiss stage, the complaint need

only allege the "legal and factual theory upon which [the] claim of interdependent conscious parallelism rests." *Nasdaq*, 894 F.Supp. at 714 (quoting *Levitch*, 495 F.Supp. at 675).

Here, plaintiffs allege that defendants acted in a similar manner in that they imposed a minimum currency conversion fee and they "generally" also assessed the second tier fee, "typically" at the level of 2%. (Compl.¶ 102.) Further, plaintiffs have alleged that the imposition of the second tier fee by the Issuing Banks would, in a competitive market without an agreement to fix prices, be against the economic self-interest of the issuing banks and would expose the banks to losing some of their best customers. (Compl.¶ 119.) Also, plaintiffs allege that the associations themselves, and their member banks' control of the associations facilitate the intra-association conspiracies by providing the basis for interfirm communications and information exchange. (Compl.¶ 91.)

These allegations, when read liberally and in light of the entire Complaint, are sufficient to draw an inference of an antitrust conspiracy. Thus, this Court cannot conclude as a matter of law that such an inference would be unreasonable. As the Complaint, taken as a whole, sufficiently pleads a Section One claim and provides satisfactory notice to the defendants, the motion to dismiss must be denied. *See Three Crown*, 817 F.Supp. at 1047–48.

### a. *VISA*

VISA filed a separate brief arguing on its own behalf that Count II should be dismissed because VISA acted as a single entity. VISA makes substantially the same arguments advanced by the other defendants regarding the single entity theory. Similarly, VISA neglects plaintiffs' express allegations regarding the necessity and use of the currency conversion fee. Thus, as the Complaint alleges that the fee does not enable a joint venture to function, and is unrelated to the efficiency of the association, an antitrust action can stand. *See United States v. Visa*, 163 F.Supp.2d at 345.

VISA also argues that the Complaint does not properly allege harm to competition. However, VISA's central point in its argument is that the current VISA foreign currency conversion practice or system "would not be possible without the network-level rules which govern" the member banks, and foreign exchange rates set at the network level are a "practical necessity within the VISA system." (VISA's Mot. to Dismiss at 8, 10.) Thus, VISA argues that plaintiffs cannot allege harm to competition because rates at the network level, such as the currency conversion fee, are a necessity, and foreign currency conversion would not be practical or possible otherwise. This argument is in stark contrast with the allegations in the Complaint that the fee is not necessary and does not provide an otherwise unavailable product. (Compl.¶ 112.) Therefore, the argument is better suited for a summary judgment motion, not a motion to dismiss.[14]

Accordingly, defendants' motion to dismiss Counts I through III is denied.

### B. *Truth in Lending Act Claim*

Count IV of the Complaint alleges claims against all defendants for violations

---

**14.** Moreover, VISA correctly notes that a principal and its agent may be incapable of conspiring under Section One. *See, e.g., Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1031 & n. 5 (2d Cir.1979). However, at the motion to dismiss stage, a factual predicate for finding that VISA and its members are agents of each other is lacking. Thus, this issue is more appropriate for a motion for summary judgment, and this Court declines to dismiss the Complaint on that basis at this time.

of various disclosure requirements under TILA and the regulations promulgated thereunder in Regulation Z. The purpose of TILA and the regulations promulgated thereunder is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601; *accord Pechinski v. Astoria Fed. Sav. and Loan Assoc.*, 238 F.Supp.2d 640, 642 (S.D.N.Y.2003). The Federal Reserve Board implements TILA through Regulation Z, codified at Title 12, Part 226 of the Code of Federal Regulations. 15 U.S.C. § 1604 (2003).

Defendants contend that all claims in count IV should be dismissed because plaintiffs do not allege specific details about their card accounts and charges. Defendants also argue that those claims should be dismissed as to VISA and MasterCard, as well as the non-card issuing bank defendants, as none of them are "creditors" under TILA. Lastly, defendants argue that plaintiffs' claims for actual damages under TILA must be dismissed because plaintiffs have not properly alleged detrimental reliance on the alleged inadequate disclosures.

### 1. *Elements of TILA Claim*

Initially, defendants argue that plaintiffs' allegations regarding the TILA violations are vague; specifically defendants claim that plaintiffs fail to allege which plaintiffs are actual cardholders, which foreign purchases are at issue, and whether the card was used primarily for consumer purposes. Defendants' arguments are misplaced on a motion to dismiss as claims for a violation of TILA are not subject to a heightened pleading standard, and thus the specificity that defendants argue is lacking is not required. *See generally Swierkiewicz v. Sorema N.A.,*

534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (reaffirming that Rule 8(a)'s notice pleading standard applies to all civil actions, except for those explicitly referred to in the Federal Rules of Civil Procedure). Plaintiffs' allegations that the representative plaintiffs named in the Complaint "paid currency conversion fees to one or more of the defendants named herein during the relevant period," suffices under Rule 8(a) notice pleading where currency conversion fees are defined to include "a fee and/or surcharge levied upon cardholders for general purpose card foreign exchange services, whether or not foreign currency is actually converted or exchanged." (Compl.¶¶ 12, 16–34.) Notably, defendants do not cite any case that dismisses a TILA claim for the types of infirmities they argue are fatal here.

### 2. *Creditor under TILA*

As a threshold issue, this Court must determine whether each defendant is a creditor as defined in TILA because that statute only regulates creditors. 15 U.S.C. § 1640(a) (making "any creditor who fails to comply" with the disclosure requirements liable); *accord Mayfield v. Gen. Elec. Capital Corp.*, No. 97 Civ. 2786(DAB), 1999 WL 182586, at *2 (S.D.N.Y. Mar.31, 1999). A creditor under TILA is defined as

> a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of the indebtedness, by agreement.

15 U.S.C. § 1602(f); *accord* 12 C.F.R. § 226.2(a)(17). The definition of a "creditor" also includes "card issuers" in certain instances. 15 U.S.C. § 1602(f); *accord* 12 C.F.R. § 226.2(a)(17). A "card issuer" in turn is defined as "any person who issues a credit card, or the agent of such person with respect to such card." 15 U.S.C. § 1602(n); *accord* 12 C.F.R. § 226.2(a)(7).

### a. *VISA and MasterCard*

Defendants argue that the Complaint is devoid of any allegation that VISA or MasterCard is a creditor under TILA or Regulation Z. Plaintiffs argue that the Complaint sufficiently alleges that VISA and MasterCard are "creditors" because it alleges that VISA and MasterCard are agents of the Issuing Bank defendants within the meaning of TILA. (Compl.¶¶ 35–40, 172.) As agents of the Issuing Bank defendants, plaintiffs argue, VISA and MasterCard fall under the definition of "card issuer" in § 1602(n), and thus are creditors under the last two sentences of § 1602(f).

The Official Staff Interpretations of the Federal Reserve Board are "dispositive in construing TILA or Regulation Z unless it is shown that the opinion is demonstrably irrational." *Mayfield*, 1999 WL 182586, at *3 (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980)); *accord Pechinski*, 238 F.Supp.2d at 644 (noting that the Federal Reserve Board's Official Staff Interpretations of Regulation Z "are to be given great deference by the judicial branch"). The Official Staff Interpretation for section 226 states, in regard to the agency aspect of the card issuer definition,

> An agent of a card issuer is considered a card issuer. Because agency relationships are traditionally defined by con-

tract and by state or other applicable law, this regulation does not define agent. Merely providing services relating to the production of credit cards or data processing for others, however, does not make one the agent of the card issuer. In contrast, a financial institution may become the agent of the card issuer if an agreement between the institution and the card issuer provides that the cardholder may use a line of credit with the financial institution to pay obligations incurred by use of credit card.

Official Staff Interpretations, 12 C.F.R. § 226, Supp. I, ¶ 2(a)(7) (2003).

Defendants argue that plaintiffs have not sufficiently pled an agency relationship between VISA and MasterCard, and their respective member banks. They contend that plaintiffs have not alleged any facts that support a conclusion of agency, and any facts that plaintiffs do allege clearly indicate that VISA and MasterCard are not their member banks' agents under the Official Staff Interpretations. Plaintiffs allege that their allegations satisfy the Rule 8(a) notice pleading standard with respect to the agency issue. Whether the plaintiffs have sufficiently pled an agency relationship between VISA and MasterCard and their respective member banks is irrelevant to this Court's analysis at this stage. Even assuming that plaintiffs have properly alleged the agency relationship, their claims that seek to hold VISA and MasterCard liable as creditors under TILA still must fail.

The Federal Reserve Board has ruled that a card issuer can only be considered a creditor, assuming it has not otherwise satisfied the definition of creditor, where that card issuer extends credit.[15]

---

**15.** Counsel for the plaintiffs' invitation to ignore the pertinent section of Regulation Z in favor of the broader statutory language is declined. Congress delegated the task of car-

*See* 12 C.F.R. § 226.2(a)(17)(iii)-(iv) (creditor means, *inter alia,* "any card issuer that extends either open-end credit or credit that is not subject to a finance charge" or "any card issuer that extends closed-end credit that is subject to finance charge or is payable by written agreement in more than four installments"). There are no allegations in the Complaint that either VISA or MasterCard ever extended any type of credit to plaintiffs. Thus, neither VISA nor MasterCard can be considered a creditor under TILA, and they are not liable for any alleged TILA violations.

b. *Non–Card Issuing Bank Defendants*

Defendants also argue that like VISA and MasterCard, the non-card issuing bank companies of the actual card-issuing bank defendants, such as the bank holding parent companies, are not alleged to be creditors under TILA.[16] Defendants note that there are no allegations that any of these companies themselves, as opposed to through a subsidiary, extend credit or issue payment cards. Plaintiffs argue that the bank holding parent companies can be held liable under TILA for their subsidiaries' faulty disclosures because they exercised such dominion over their subsidiaries that the two are fairly treated as one, which is effectively a veil-piercing argument.

Initially, the Complaint contains no allegations that could hold Citibank (Nevada)

N.A. and Household Credit Card Service, Inc. liable as creditors under TILA, either directly or derivatively. Thus, this Court finds that the Complaint fails to state a claim as to Count IV against Citibank (Nevada) N.A. and Household Credit Card Service, Inc., and dismisses that claim against them with prejudice.

 With respect to the bank holding parent companies, determining the proper pleading standard for a veil-piercing claim has been labeled a "knotty question" by some courts in this district. *See, e.g., United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 222–23 (S.D.N.Y.2002); *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 170 F.R.D. 361, 374 (S.D.N.Y. 1997). The "knotty" issue arises when the specific veil-piercing claim alleged by a plaintiff is based on allegations of fraud. *See United Feature Syndicate,* 216 F.Supp.2d at 223. This Court finds that the more well-reasoned rule is that where the veil-piercing claims are not based on allegations of fraud, the liberal "notice pleading" standard of Rule 8(a) applies. *See United Feature Syndicate,* 216 F.Supp.2d at 223; *Old Republic Ins.,* 170 F.R.D. at 375; *Rolls–Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 122 (S.D.N.Y.1996). Where the veil-piercing claims are based on allegations of fraud, however, the heightened pleading standard of Rule 9(b) is the lens through which those allegation must be examined. *See*

rying out the purpose of TILA to the Federal Reserve Board, *see* 15 U.S.C. § 1604(a), and those regulations are to be deferred to when construing the language of TILA. *See Milhollin,* 444 U.S. at 566, 100 S.Ct. 790; *Mayfield,* 1999 WL 182586, at *3.

**16.** The non-card issuing defendants are as follows: defendants Citigroup, Inc.; Bank of America Corporation; Bank One Corporation; J.P. Morgan Chase & Co.; Providian Financial Corp.; Household International,

Inc.; MBNA Corporation; Citibank (Nevada) N.A.; and Household Credit Card Service, Inc. (Compl.¶¶ 41, 45, 49, 52, 56, 61, 66, 68, 70.) Defendants Citibank (Nevada) N.A. and Household Credit Card Service, Inc. are alleged to merely process certain general purpose card transactions. (Compl.¶¶ 45, 68.) The remaining non-card issuing bank defendants are bank holding parent companies of the card-issuing defendants.

*United Feature Syndicate*, 216 F.Supp.2d at 223; *Old Republic Ins.*, 170 F.R.D. at 375; *Rolls–Royce*, 929 F.Supp. at 122; *see also Network Enters., Inc. v. APBA Offshore Prods., Inc.*, No. 01 Civ. 11765(CSH), 2002 WL 31050846, at *6 (S.D.N.Y. Sept.12, 2002) ("Given that the elements of fraud need not undergird the veil-piercing claim, it necessarily follows that Rule 9(b) does not come into play where fraud is not part of it."). As an example of the difference, New York law permits a court to pierce the corporate veil where either there is a fraud or when the corporation has been used as an alter-ego. An alter-ego can be established where the parent exercised complete domination of the subsidiary and that domination was used to commit a fraud or wrong. *United Feature Syndicate*, 216 F.Supp.2d at 223; *Old Republic Ins.*, 170 F.R.D. at 374; *Rolls–Royce*, 929 F.Supp. at 121–22. Thus, at least in New York, since veil-piercing can be established without proving any element of fraud, the heightened pleading standard does not apply to every veil-piercing allegation. Without determining what substantive law, and thus what pleading standard, applies,[17] this Court finds that even under the liberal notice pleading standard of Rule 8(a), plaintiffs have failed to allege a TILA claim based on a veil-piercing theory.

▮ The only allegations in the entire Complaint that support plaintiffs' veil-piercing theory are the allegations, which appear consistently in each section addressing each bank holding company, that the bank holding company "exercised such dominion and control over its subsidiaries ... that it is liable according to the law for the acts of such subsidiaries under the facts alleged in this Complaint," and that the card-issuing defendants were wholly owned subsidiaries of their respective bank holding companies. (Compl.¶¶ 41–72.) These purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard. *See Old Republic Ins.*, 170 F.R.D. at 375; *Zinaman v. USTS New York, Inc.*, 798 F.Supp. 128, 132 (S.D.N.Y.1992); *see also Network Enters.*, 2002 WL 31050846, at *7 ("The imposition of successor liability, as with corporate veil-piercing, requires the allegation and proof of specific facts, none of which have been alleged in the proposed Amended Complaint."); *Kingdom 5–KR–41, Ltd. v. Star Cruises PLC*, No. 01 Civ. 2946(AGS), 2002 WL 432390, at *12 (S.D.N.Y. March 20, 2002) ("[I]n order to overcome the presumption of separateness afforded to related corporations, [plaintiff] is required to plead more specific facts supporting its claims, not mere conclusory allegations."). Plaintiffs have failed to allege any facts to support their conclusion that the bank holding companies exercised such dominion and control over its subsidiaries. The unadorned invocation of dominion and control is simply not enough. For example, there is no allegation as to how or why the holding companies have dominion and control over the subsidiaries. *Cf. Welch Allen, Inc. v. New Image Indus., Inc.*, No. 97 Civ. 240, 1998 WL 238623, at *2 (N.D.N.Y. May 5, 1998) (finding that complaint alleged parent and subsidiary have the same officers, use the same name in their advertising, and parent otherwise controls actions of subsidiary); *Rolls–Royce*, 929 F.Supp. at 122 (finding that complaint alleged parent used its control over subsidiary to hide assets from credi-

---

**17.** Notably, the parties have not argued what substantive law should apply to the veil-piercing analysis.

tors by transferring proceeds between the two companies).

Plaintiffs' reliance on cases noting that veil-piercing is a very fact-specific analysis, conducted only after a full examination of the parties and their relationships, is misplaced. The plaintiffs in those cases alleged sufficient facts to support their allegations of veil-piercing. *See, e.g., Federal Trade Comm'n v. Citigroup, Inc.,* 239 F.Supp.2d 1302, 1306–07 (N.D.Ga.2001) (finding that complaint alleged that parent acquired subsidiary and merged the domestic consumer finance businesses together); *Arrington v. Colleen, Inc.,* Nos. AMD 00–191, AMD 00–421, 2000 U.S. Dist. Lexis 20651, at *20 (D.Md. Aug. 7, 2000) (finding that complaint alleged defendants' intimate involvement in creation and ownership of corporate entity and defendants' facilitation of the engagement of the wrong alleged).

### c. *Citigroup and Diners Club*

The Citibank defendants separately argue that there are no allegations that defendants Citigroup and Diners Club are creditors under TILA. Citigroup, the bank holding company, argues that there are no allegations that it issued credit cards or extended credit to anyone. Defendants argue that plaintiffs' allegation that Citigroup issues credit cards through its subsidiaries does not satisfy the requirements of TILA. Lastly, defendants argue that Diners Club is not a creditor under TILA since it is not the entity that issues Diners Club cards or extends credit to Diners Club cardholders.[18]

While plaintiffs argue that Citigroup exercised such dominion and control over its card-issuing subsidiaries that it should be held liable for those subsidiaries' TILA violations, the Complaint contains the barest of allegations of dominion and control. (Compl. ¶ 46.) For the same reasons that this Court found plaintiffs' allegations against the other bank holding companies insufficient as to TILA claims based on a veil-piercing theory, the allegations against Citigroup are also insufficient.

As for Diners Club, defendants attach an "exemplar cardmember agreement" to their brief and argue that the agreement evidences that Citibank (South Dakota) is the true issuer of Diners Club charge cards and the actual entity that extends credit to the cardholder. Defendants argue that the agreement can be considered because the plaintiffs incorporated it into their Complaint by reference and it is integral to the Complaint. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *In re Merrill Lynch & Co, Inc. Research Reports Sec. Litig.,* 02 MDL 1484(MP), 2003 WL 21500293, at *1 (S.D.N.Y. June 30, 2003).

Indeed, "[o]rdinarily our consideration is limited to the face of the complaint and documents attached to the complaint are incorporated by reference, but here we may consult [the exemplar] Agreement . . . because [it][is] integral to [plaintiffs'] claims and [plaintiffs] had notice of that information." *Schnall v. Marine Midland Bank,* 225 F.3d 263, 266 (2d Cir.2000); *accord Merrill Lynch,* 2003 WL 21500293, at *1 (noting that "documents 'integral' to the complaint and relied upon in it, even if

---

**18.** The Citigroup defendants also argue that plaintiffs have failed to allege that defendant Universal Financial Corp. ("UFC") is a creditor under TILA because it only issued cards to businesses, not consumers, during the relevant time period, and thus is outside the scope of TILA. As accurate a picture as that may be of UFC's practices during the relevant time period, it is evidence outside the Complaint and this Court will not consider it. Thus, plaintiffs' allegations that UFC issued cards to one or more plaintiffs suffice to allege that UFC was a creditor under TILA on a motion to dismiss.

not attached or incorporated by reference" can be considered on a motion to dismiss). However, this Court declines to consider the "exemplar agreement" provided by defendants since this Court is not satisfied that this agreement is the form agreement any of the plaintiffs signed and Diners Club did not inform the Court how many different form agreements it has for its cardmembers. Without such information, it would be inappropriate to consider this "exemplar agreement" on a motion to dismiss. This Court is confident that this issue can be developed fully in discovery.

Accordingly, Count IV must be dismissed with prejudice as to VISA, Master-Card, Citibank (Nevada) N.A., and Household Credit Card Service, Inc. Count IV is dismissed without prejudice and with leave to replead against defendants Citigroup, Inc., Bank of America Corporation, Bank One Corporation, J.P. Morgan Chase & Co., Providian Financial Corp., Household International, Inc., and MBNA Corporation. Finally, defendants' motion to dismiss Count IV as to the card-issuing defendants is denied.

### 3. *Actual Damages*

Defendants contend that plaintiffs' claim for actual damages under TILA for disclosure violations must be dismissed since plaintiffs have not alleged detrimental reliance. Plaintiffs counter that detrimental reliance is not an element of an actual damages claim under TILA, and even if it is, they have pled such reliance.

■ A private right of action under TILA exists for civil liability against any creditor who fails to comply with any requirement imposed under TILA. 15 U.S.C. § 1640(a) (2003). A plaintiff may pursue "any actual damages sustained by [him] as a result of the failure" to make the required disclosures, and/or so-called statutory damages, which are capped at $500,000. 15 U.S.C. § 1640(a)(1)-(2). It is well-established that a plaintiff must show detrimental reliance to establish actual damages for a TILA violation. *See Demry v. Citibank (South Dakota), N.A.,* No. 01 Civ. 9959(HB), 2003 WL 179772, at *4 (S.D.N.Y. Jan.24, 2003); *Schuster v. Citibank (South Dakota), N.A.,* No. 01 Civ. 5940(LMM), 2002 WL 31654984, at *3 (S.D.N.Y. Nov.21, 2002); *Gold Country Lenders v. Smith,* 289 F.3d 1155, 1157 (9th Cir.2002); *Turner v. Beneficial Corp.,* 242 F.3d 1023, 1026–28 (11th Cir.2001) (en banc); *Perrone v. General Motors Acceptance Corp.,* 232 F.3d 433, 436–40 (5th Cir.2000); *Peters v. Jim Lupient Oldsmobile Co.,* 220 F.3d 915, 916–17 (8th Cir. 2000); *Stout v. J.D. Byrider,* 228 F.3d 709, 718 (6th Cir.2000); *see also Bizier v. Globe Fin. Servs., Inc.,* 654 F.2d 1, 4 (1st Cir. 1981) (noting, in *dicta,* that "such conventional contract-law elements as damages and causation must be shown in addition to a threshold showing of a violation of a TILA requirement"). This Court agrees with those courts and declines to deviate from the rule requiring detrimental reliance for a claim of actual damages under TILA.

The statute's language, as well as its legislative history, supports such a finding. Section 1640(a)(1) specifically states that a plaintiff may recover actual damages sustained "as a result" of a TILA violation. 15 U.S.C. § 1640(a)(1). Notably, § 1640(a)(2), which provides for statutory damages, contains no such limiting or causal connection language. *See* 15 U.S.C. § 1640(a)(2); *see also Perrone,* 232 F.3d at 436 ("While the actual damages provision requires a causal connection with the disclosure violation, 15 U.S.C. § 1640(a)(1), the statutory damages provision dispenses with causation and imposes a penalty solely for failure to comply with disclosure requirements."). This Court agrees with

the reasoning of the Fifth Circuit in *Perrone:*

> Without a causation requirement, actual damages would overlay the statutory damages for no apparent reason. Conceptually, however, statutory and actual damages perform different functions: statutory damages are reserved for cases in which the damages caused by a violation are small or difficult to ascertain. Actual damages may be recovered where they are probably caused by the violation.

232 F.3d at 436; *accord Turner*, 242 F.3d at 1025–26 ("Under this regime, statutory damages provide at least a partial remedy for all material TILA violations; however, actual damages ensure that consumers who have suffered actual harm due to a lender's faulty disclosures can be fully compensated, even if the total amount of their harm exceeds the statutory ceiling on TILA damages.").

Further, the legislative history of the 1995 amendments to TILA states, "Congress provided for statutory damages because actual damages in most cases would be nonexistent or extremely difficult to prove. To recover actual damages, consumers must show that they suffered a loss because they relied on an inaccurate or incomplete disclosure." H.R.Rep. No. 193, 104th Cong., 1st Sess. (1995); *accord Turner* 242 F.3d at 1028; *Demry*, 2003 WL 179772, at *4. Thus, this Court finds that detrimental reliance is an element of a claim for actual damages under TILA, and therefore joins the five circuit courts and two other judges in this district to do so.

### a. *Presumption of Reliance*

Plaintiffs maintain that if detrimental reliance is required for a claim for actual damages under TILA, such reliance should be presumed from the allegations in the Complaint in this "failure to disclose" case. Plaintiffs contend that where the TILA violation is a material omission, there should be a presumption of reliance as there is in the securities fraud arena.[19] *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Mills v. Elec. Automobile–Lite Co.,* 396 U.S. 375, 382, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Defendants urge this Court to adopt the reasoning in *Perrone,* and hold that reliance cannot be presumed for a TILA claim.

The Fifth Circuit in *Perrone,* addressing this exact issue, noted that the plaintiffs in that case "attempt[ed] to analogize TILA to Rule 10b–5 by stating the mandate that lessors disclose certain costs associated with obtaining credit ... makes the existence of such costs 'material' facts." *Perrone,* 232 F.3d at 439–40. The Fifth Circuit held, however, that " '[u]nlike 10b–5, the roots of Truth in Lending are not in protection against common law fraud, and while any Truth in Lending violation necessarily makes the task of shopping for credit more difficult, that does not translate into a 'material' violation.' " *Perrone,* 232 F.3d at 440 (quoting *McCoy v. Salem Mortgage Co.,* 74 F.R.D. 8, 13 (E.D.Mich. 1976)).

Plaintiffs stress that the remedial nature of TILA as a consumer protection statute favors a more liberal interpretation of the type of reliance needed for actual damages. This Court disagrees and finds

---

**19.** Of course, plaintiffs also allege improper disclosure violations of TILA, as well as omission violations of TILA. (Compl.¶ 170(b).) Plaintiffs do not argue that a presumption of reliance should be applied for the improper disclosure claim. Thus, allegations of actual detrimental reliance are necessary for claims of actual damages under TILA for improper disclosure claims.

that the better reasoned conclusion is that actual detrimental reliance must be proven for actual damages, and no presumption of reliance can be applied.

As the Fifth Circuit held in *Perrone*, violations of TILA are dissimilar from violations of Rule 10b–5 in the securities fraud context concerning reliance. The TILA reliance requirement stems from the express language in the statute as opposed to common law fraud in Rule 10b–5 cases.[20] *See* 15 U.S.C. § 1640(a)(1) (plaintiff may recover "any actual damages sustained by [her] as a result of the failure" to make the required disclosures); *Basic, Inc. v. Levinson*, 485 U.S. 224, 243–44, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("We agree that reliance is an element of a Rule 10b–5 cause of action. Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."); *Perrone*, 232 F.3d at 436–40 ("[U]nlike 10b–5, the roots of Truth in lending Act are not in protection of common law fraud,"); *see also Turner*, 242 F.3d at 1028 ("We find that [the statute's] language indicates that the statute's authors intended that plaintiffs must demonstrate detrimental reliance in order to be entitled to actual damages under TILA."). This Court declines to turn aside from the express language of the statute.

Further, any presumption of reliance for actual damages claims would obliterate the differences between actual damages claims and statutory damages claims, a result that Congress could not have intended. In TILA, Congress created a measure to protect consumers from deception in a growing field. As part of that measure, Congress provided for two different types of damages, actual and statutory. *See* 15 U.S.C. § 1640(a)(1)-(2). "Under this re-

gime, statutory damages provide at least a partial remedy for *all* material TILA violations; however, actual damages ensure that consumers who have suffered actual harm due to a lender's faulty disclosures can be fully compensated, even if the total amount of their harm exceeds the statutory ceiling on TILA damages." *Turner*, 242 F.3d at 1026 (emphasis added); *accord Perrone*, 232 F.3d at 436. Plaintiffs attempt to homogenize the differences between actual and statutory damages undermines the statute and Congressional purpose. Actual damages were not meant to be available for every violation of TILA; statutory damages fill that role. Notably, alternative types of damages are not available under Rule 10b–5 or any securities fraud laws.

Plaintiffs complain that without a presumption of reliance on omission cases, actual damages claims would be too difficult to prove. However, that is precisely the statutory scheme that Congress created. "This difficulty seems to have been the impetus for establishing a scheme of statutory damages, and it seems likely that if actual damages could be computed by a simple formula, no statutory damage provision would have been necessary." *McCoy*, 74 F.R.D. at 13. In fact, it is precisely "[b]ecause such a showing is so difficult, [that] statutory damages are available to a plaintiff who can prove a technical violation." *McCoy*, 74 F.R.D. at 13. Further, as the Fifth Circuit found in *Turner*, "[t]he legislative history emphasizes that TILA provides for statutory remedies on proof of a simple TILA violation, and requires the more difficult showing of detrimental reliance to prevail on a claim for actual damages." 242 F.3d at 1028.

---

**20.** It is noteworthy that Plaintiffs argue for a fraud-based presumption of reliance on this issue, but elsewhere insist that TILA based claims are not subject to the same heightened pleading standard as fraud claims.

Lastly, the remedial nature of TILA does not compel a different result. Unlike securities actions, even without the presumption of reliance consumers may hold defendants liable for TILA violations through statutory damages claims. Thus, consumers can further TILA's goals without receiving actual damages. Moreover, TILA's remedial nature does not permit this Court to ignore an express element of a private right of action found in the text of the statute.

Accordingly, plaintiffs cannot rely on a presumption of reliance and therefore must prove detrimental reliance. As plaintiffs have not alleged detrimental reliance, their claims for actual damages under TILA are dismissed without prejudice and with leave to renew.

### 4. *TILA Conspiracy and Aiding or Abetting*

Lastly, defendants argue that plaintiffs' TILA claims against the non-card issuing defendants should be dismissed because there can be no liability for conspiracy to violate TILA, nor any liability for aiding and abetting a violation of TILA. Plaintiffs argue that this Court should interpret TILA broadly due to its remedial nature and find that there are private causes of action for conspiracy to violate TILA, and aiding and abetting TILA violations. To do otherwise, plaintiffs contend, would allow circumvention of TILA by "ingenious malefactors."

■■■ TILA provides that "any creditor who fails to comply with any requirement imposed under this part ... with respect to any person is liable to such person." 15 U.S.C. § 1640(a). As this Court noted previously, plaintiffs have not properly alleged that the non-card issuing defendants are creditors under TILA or that they are

liable for their subsidiary's TILA violations. There is no express private right of action anywhere in the statutory scheme for conspiracy to violate TILA or aiding and abetting TILA violations. TILA creates a duty to disclose certain information only on behalf of "creditors" as that term is defined in TILA. *See* 15 U.S.C. § 1631(a)-(b) (2003). Creditors, in turn, are liable for violations of that duty only to the individuals or entities to whom they owe that duty. *See* 15 U.S.C. § 1640(a). TILA does not extend that duty or the benefits of that duty to anyone else. Nor does TILA make creditors liable to anyone for any violations of the disclosure requirements. Thus, based on the plain language of the statute there is no claim for conspiracy or aiding and abetting under TILA.

The only decision addressing this issue has also found that the language in TILA does not provide for secondary liability. *See Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 692–94 (E.D.Pa.1973). The *Weiner* court found that "the Truth-in-Lending Act makes explicit that only a person to whom the duty of disclosure is owed can recover for breach of that duty. It is obvious that in order for a bank to be obligated to disclose credit terms to an individual, that individual must be doing business with that bank." *Weiner,* 358 F.Supp. at 692. In an analogy particularly relevant to this action, the *Weiner* court held that the "Truth-in-Lending laws establish duties owed by creditors to their customers. There is no provision in any of these statutes similar, for example, to Section 1 of the Sherman Act, 15 U.S.C. § 1, which makes 'conspiracy' or 'combination' an actionable wrong." *Weiner,* 358 F.Supp. at 693. Thus, the *Weiner* court held that a claim for conspiracy to violate TILA is not actionable.[21] *See Weiner,* 358 F.Supp. at 694.

---

**21.** Although the *Weiner* court did not address a claim for aiding and abetting a TILA claim,

The Supreme Court analysis in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), and the Second Circuit's interpretation of *Central Bank* in *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir.1998), are instructive. In *Central Bank* the Supreme Court held that there was no aiding and abetting civil liability for a § 10(b) claim. *See* 511 U.S. at 176–77, 191, 114 S.Ct. 1439. The Court held that § 10(b) itself did not prohibit aiding and abetting the commission of a manipulative or deceptive act. *Central Bank*, 511 U.S. at 177, 114 S.Ct. 1439. The Supreme Court noted that, as evidenced by companion securities statutes to § 10(b), "Congress knew how to impose aiding and abetting liability when it chose to do so." *Central Bank*, 511 U.S. at 176, 114 S.Ct. 1439. It also held that "the statutory text controls the definition of conduct covered by [the statute]." *Central Bank*, 511 U.S. at 175, 114 S.Ct. 1439. Permitting a claim for aiding and abetting a § 10(b) claim would "extend liability beyond the scope of conduct prohibited by the statutory text." *Central Bank*, 511 U.S. at 177, 114 S.Ct. 1439. Having concluded that the statute does not explicitly provide for aiding and abetting liability, the Court held that that finding resolved the case. *Central Bank*, 511 U.S. at 177, 114 S.Ct. 1439. Nevertheless, despite its reliance on the interpretation of the statute's language, the Supreme Court went further and reviewed the statute's legislative history and policy considerations. The Supreme Court concluded that neither the legislative history nor public policy considerations created a cause of action for aiding and abetting a § 10(b) violation. *See Central Bank*, 511 U.S. at 181–189, 114 S.Ct. 1439.

The Second Circuit's opinion in *Dinsmore* expanded the *Central Bank* holding to prohibit claims for conspiracy to violate the securities laws. 135 F.3d at 842. The Second Circuit noted,

> [c]ritically, as in the case of aiding and abetting, there is no mention of conspiracy in the text of § 10(b). Just as Congress clearly knew how to impose aiding and abetting liability when it chose to do so, thereby suggesting that its absence from § 10(b) should not be disregarded, the existence of statutes expressly providing for conspiracy liability ... warrants the same conclusion.

*Dinsmore*, 135 F.3d at 842. The *Dinsmore* court also found that there was no support in the legislative history for a claim for conspiracy. *See* 135 F.3d at 841–42.

This Court finds the reasoning in *Central Bank*, *Dinsmore*, and *Weiner*[22] persuasive. Since TILA's statutory text does not provide for conspiracy or aiding and abetting claims, and the legislative history supports that conclusion, claims for con-

---

its reasoning applies to those claims as well.

**22.** Plaintiffs' attempt to distinguish *Weiner* based on the fact that the opinion was written thirty years ago, and based on an alleged significantly different factual scenario. Plaintiffs' arguments are unavailing. Plaintiffs do not articulate why this Court should disregard *Weiner* based simply on its age. Plaintiffs do not argue that the language of TILA has changed significantly in the last thirty years, or that the state of the law has changed.

Further, the *Weiner* court did not rely on the facts before it to find that a claim for conspiracy did not exist. Rather, it based its ruling on the fact that conspiracy was not included within the terms of the statute itself. *See Weiner*, 358 F.Supp. at 692–94; *see also Dinsmore*, 135 F.3d at 843 ("The Supreme Court in *Central Bank* did not in any way rely on the level of scienter at issue, but on the fact that aiding and abetting was not included within the terms of the statute itself.")

spiracy or aiding and abetting cannot stand.[23]

Plaintiffs' reliance on *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386(KMW), 2002 WL 319887 (S.D.N.Y. Feb.28, 2002), is misplaced. In that case, the court held that *Central Bank* and *Dinsmore* do not automatically preclude a finding of a claim for conspiracy or aiding and abetting where such an action was not explicitly provided for by the statute. *See Wiwa*, 2002 WL 319887, at *16. The Court noted,

> [n]either *Central Bank* nor *Dinsmore* holds that a statute must explicitly allow for secondary liability in order for a court to hold aiders and abetters or co-conspirators liable. Rather, *Central Bank* and *Dinsmore* support the proposition that the scope of liability under a statute should be determined based on a reading of the text of the specific statute.

*Wiwa*, 2002 WL 319887, at *16. In that regard, the *Wiwa* court found that both the language and legislative history of the Torture Victim Protection Act of 1991 supported liability for aiders and abetters. *See Wiwa*, 2002 WL 319887, at *16. But that is not the case here. Nothing in either TILA's text or legislative history supports a claim for aiding and abetting or conspiracy. Thus, the *Wiwa* case is inapposite.[24]

Accordingly, defendants motion to dismiss Count IV is granted in part and denied in part, as follows: (1) Count IV in its entirety is dismissed with prejudice as to defendants VISA, MasterCard, Citibank (Nevada), and Household Credit Card Service; (2) Count IV in its entirety is dismissed without prejudice and with leave to replead as to defendants Citigroup, Inc., Bank of America Corporation, Bank One Corporation, J.P. Morgan Chase & Co., Providian Financial Corp., Household International, Inc., and MBNA Corporation; (3) the claims in Count IV for actual damages are dismissed without prejudice and with leave to replead; (4) Count IV is dismissed with prejudice as to plaintiffs' claims of conspiracy and/or aiding and abetting; and (5) the motion to dismiss Count IV as to all other parties is denied.

## Conclusion

Accordingly, defendants' motion to dismiss the Complaint is denied in part and granted in part. Specifically, defendants motion to dismiss Counts I through III is denied. Their motion to dismiss Count IV is denied in part and granted in part, as follows: (1) Count IV in its entirety is dismissed with prejudice as to defendants VISA, MasterCard, Citibank (Nevada) N.A., and Household Credit Card Service, Inc.; (2) Count IV in its entirety is dismissed without prejudice and with leave to replead as to defendants Citigroup, Inc., Bank of America Corporation, Bank One Corporation, J.P. Morgan Chase & Co., Providian Financial Corp., Household International, Inc., and MBNA Corporation; (3) the claims in Count IV for actual damages are dismissed without prejudice and

---

**23.** It is also noteworthy that TILA was amended in 1982 to eliminate "arrangers" of credit from the definition of creditor under TILA. Pub.L. No. 97–320, 96 Stat. 1469, § 702 (1982); Pub.L. No. 96–221, 94 Stat. 132, § 602 (1980). This amendment further evidences Congress's intent to prohibit liability for aiding or abetting a TILA violation.

**24.** Further, plaintiffs' argument that a claim for conspiracy and aiding and abetting should be found to be implied in TILA if the Court reads the statute liberally in accord with its remedial nature, is unpersuasive. As the Supreme Court stated in *Central Bank*, "[p]olicy considerations cannot override our interpretation of the text and structure of the Act." 511 U.S. at 188, 114 S.Ct. 1439.

with leave to replead; (5) Count IV is dismissed with prejudice as to plaintiffs' claims of conspiracy and/or aiding and abetting; and (6) the motion to dismiss Count IV as to all other parties is denied.

Further, defendants First USA Bank, N.A. and Bank One Corporation motion to compel arbitration of plaintiff Ruga's claims is granted. Also, defendants Bank of America, N.A. (USA) and Bank of America Corporation's motion to compel arbitration with respect to plaintiff Ross's claims is granted.

To the extent permitted by this Memorandum and Order, plaintiff shall serve and file a further amended complaint no later than August 15, 2003.

SO ORDERED.